624 So.2d 1156 (1993)
SUCCESSION OF Louis LAUGA, Sr.
No. 93-CA-0034.
Supreme Court of Louisiana.
September 10, 1993.
Rehearings Denied November 4, 1993.
*1157 Richard P. Ieyoub, Atty. Gen., Dale Charles Wilks, Melinda M. Tucker, William M. Detweiler, for applicant.
Michael C. Ginart, Jr., for respondent.
Ivor A. Trapolin, Miles G. Trapolin, for Hibernia Nat. Bank, amicus curiae.
Steven O. Medo, Jr., Charles E. Bruneau, Jr., for Carol V. Jurisich, amicus curiae.
Dominic N. Varrecchio, for Max Nathan, Jr., Donna J. Burmat, Laurie J. Henderson, Peter Jurisich, Alan Jurisich, Linda M. Mollere, Steven Jurisich, amicus curiae.
Vincent T. LoCoco, Frederick W. Swaim, Jr., for Patricia Vivian M. Brooks, amicus curiae.
Sidney M. Blitzer, Jr., for Sidney M. Blitzer, Jr., amicus curiae.
DENNIS, Justice.[*]
We are called upon to decide whether a law that purports to abrogate forced heirship's principle and right of equality of heirship among children is unconstitutional because it violates Article XII, § 5 of the 1974 Louisiana Constitution, which declares that "[n]o law shall abolish forced heirship." Civil Code article 1493, as amended in 1989 and 1990, purports to extinguish forced heirship for persons who upon the death of their decedents are competent and 23 years of age. The trial court declared amended Article 1493 unconstitutional because it violates Article XII, § 5 and because it arbitrarily, capriciously, or unreasonably discriminates against a person because of age in violation of Article I, § 3 of our state constitution. The defendant and the intervenor appealed. La. Const. art. V, § 5(D)(1). We affirm and amend the judgment to declare unconstitutional not only amended Article 1493 but also the amendatory acts of 1989 and 1990 in their entirety.
*1158 The declaration that "[n]o law shall be passed abolishing forced heirship" originally was placed in the 1921 Louisiana Constitution to preserve the core principle of that legal institutionthe equality of heirship between children as to a forced portion of their decedent's estate. The purpose of the constitutional provision was to further the state interests in the prevention of excessive concentrations of wealth and the promotion of family harmony and solidarity through deterrence of intra-family discord and litigation. Subsequently, our courts, commentators, and the legislature interpreted the constitutional provision as guaranteeing to every child an individual right to an equal share of a forced portion of his or her decedent's estate. According to the weight of scholarly commentary and juristic dictum, the constitutional provision allowed legislative enactment of implemental and regulatory laws subject to the limitation of these basic precepts.
Article XII, § 5 of the 1974 Louisiana Constitution continues in effect the essential meaning of the law established under Article IV, § 16 of the 1921 Louisiana Constitution. Article XII, § 5 models its stipulations on the very similar provisions of the 1921 Constitution and the construction previously placed on those provisions by the jurisprudence. Accordingly, we conclude that Article XII, § 5 guarantees the individual right of a child to an equal share of a forced portion of his or her decedent's estate and maintains the correlative public principle of equality of heirship, which furthers the goals of dispersion of wealth, family solidarity, and reduction of litigation. Subject to and not inconsistent with these basic precepts, the legislature may pass laws implementing and regulating forced heirship.
Civil Code article 1493, as amended in 1989 and 1990, is unconstitutional because it violates Article XII, § 5 in three different but interrelated ways. First, the law violates and deprives each plaintiff of his individual right as a child to an equal share of a forced portion of his decedent's estate; furthermore, the law professes to abolish the right of forced heirship as an individual constitutional right and relegate it to the status of a statutory entitlement. Second, the law purports to abrogate completely Article XII, § 5's guarantee of the core principle of equality of heirship among children with respect to a forced portion of their decedents' estates. Third, the law purports to render wholly ineffective the legal institution of forced heirship to further the state purposes for which it was elevated to constitutional status. In fact, the law promotes the very evils that the forced heirship guarantee was designed to combat, that is, the unjust disinheritance of children which leads to family disharmony and litigation among siblings and the concentration of family estates in fewer than all the children, to the economic detriment of society and the resulting impoverishment of the disinherited children. In sum, amended Civil Code article 1493 abolishes the legal institution of forced heirship with respect to all of its ends and purposes as effectively as would a simple repeal of all forced heirship laws.
Civil Code article 1493, as amended in 1989 and 1990, is the product of two legislative acts. Each act contains an invalid provision that violates Article XII, § 5 of the 1974 Louisiana Constitution. The invalid portion of each act is not separable from the other provisions of the act. Therefore, the trial court judgment will be amended to declare wholly unconstitutional both amendatory acts.
It is not necessary for this court to reach the question of whether the law or laws also discriminate unconstitutionally against the plaintiffs and other children because of age.

FACTS
Louis Lauga, Sr. died July 11, 1991, survived by his three children, Louis Lauga, Jr., Ray E. Lauga, Sr., and Glenn F. Lauga. All of the children were competent and over the age of twenty-three years at the time of Louis Lauga, Sr.'s death. The decedent, by statutory will dated September 5, 1990, left his entire estate to one child, Louis Lauga, Jr. On August 16, 1991, the will was probated and Louis Lauga, Jr. was placed in possession of his father's estate.
Ray E. Lauga, Sr. and Glenn F. Lauga filed suit against the succession of Louis Lauga, Sr. to annul their father's statutory *1159 will. In their petition, they challenged the constitutionality of Louisiana Civil Code article 1493, as amended by Act No. 788 of 1989 and by Act No. 147 of 1990, contending that the law violates Article XII, § 5 and Article I, § 3 of the 1974 Louisiana Constitution. The Attorney General was served pursuant to Louisiana Code of Civil Procedure article 1880. Louis Lauga, Jr. and the Attorney General moved for summary judgment declaring that the amendments to Civil Code article 1493 were constitutional. After considering briefs and oral arguments, the trial court declared Civil Code article 1493, as amended in 1989 and 1990, unconstitutional because it violates Louisiana Constitution Article I, § 3 and Article XII, § 5 (1974). From the declaration of unconstitutionality, Louis Lauga, Jr., as defendant, and the Attorney General, as intervenor, appealed. La. Const. art. V, § 5(D)(1).

I. The Concept of "Forced Heirship" Prior to the 1974 Louisiana Constitution: Early History, Elevation to Constitutional Status, Public Principle and Individual Right, Judicial and Scholarly Interpretation
Civil law systems typically protect children of all ages, and sometimes ascendants and other descendants, from disinheritance by securing to them a minimum share of their decedent's estate which cannot be defeated by mortis causa or inter vivos gratuitous donations. Glendon, Family Law Reform in the 1980's, 44 La.L.Rev. 1553, 1570 (1984). See also, 3 Yiannopoulos, Louisiana Civil Law TreatisePersonal Servitudes § 21 at 51 (1989). From its beginning in about 1700, Louisiana's forced heirship doctrine followed this basic civil law concept while modelling its particular provisions on French and Spanish sources. In 1921, forced heirship was elevated to the status of a constitutionally protected legal institution. Article IV, § 16 of the 1921 state constitution contained a prohibition declaring that "[n]o law shall be passed abolishing forced heirship...." Subsequently, our courts and commentators interpreted this provision not only as a limitation upon the power of the legislature to abolish forced heirship and as a grant of constitutional protection to the legal institution to further important social purposes but also as a guarantee of the individual constitutional right of every child to a forced portion of his or her decedent's estate.

A. Early History
The doctrine of forced heirship has prevailed in Louisiana since its colonization by French settlers at the beginning of the eighteenth century. Continuously during Louisiana's history as a colony, territory, and state, its laws have imposed a general restriction upon every person's ability to gratuitously dispose of property, i.e., in cases when the disposing person had an heir who is his lineal relative, his gratuitous dispositions could affect only a portion of his estate; the balance was reserved to his descendant or ascendant heirs, who were called forced heirs.
The French royal charters extended forced heirship to Louisiana as part of the Laws and Custom of Paris. For over half a century without interference the Louisiana settlers adhered to the traditions of the French law as faithfully as did their kin back in France. The French cession of Louisiana to Spain had no effect upon forced heirship because the institution was equally emphasized in the law of both countries. After France regained Louisiana and conveyed the territory to the United States, the conflict between the invading common law and the entrenched civil law was sharp, but the inhabitants' strong sympathy for the civil law prevailed. Dainow, The Early Sources of Forced Heirship: Its History in Texas and Louisiana, 4 La.L.Rev. 42 (1941).
In the Louisiana Civil Code of 1808, properly styled the Digest of the Civil Laws now in Force in the Territory of Orleans, the redactors reiterated the old Spanish rules regarding the legitime. A parent's donations either inter vivos or mortis causa could not exceed one-fifth of his property to the prejudice of his children, and those of a child could not exceed one-third to the prejudice of the parents. Id. at 59.
When the Code was revised in 1825, the disposable portion was increased and, in keeping with the French Civil Code, graduated in accordance with the number of children. *1160 Children of all ages were protected from disinheritance by being guaranteed a minimum share of the decedent's estate that could not be defeated by will or inter vivos gratuitous disposition. Such dispositions could not exceed two-thirds of the estate if the decedent left one child; one-half if he left two children; and one-third if he left a greater number. Id. at 59-60. This provision was carried over into the Revised Civil Code of 1870 as Article 1493.
Forced heirship continued to be venerated throughout the nineteenth century. Early in the twentieth century it was identified by Professor Charles Payne Fenner as one of Louisiana's most distinguished legal institutions:
[T]here are certain provisions of the Civil Code of Louisiana that are something more than mere laws; that may be said to rise to the dignity of institutions. Among these are the articles of the Code providing for what, among Louisiana lawyers, is known as the doctrine of forced heirship....
Fenner, An Example of Homeric Nodding in Relation to the Reduction of Donations Inter Vivos, 1 So.L.Q. 129 (1916).

B. Elevation to Constitutional Status
In construing a constitutional provision, the courts may consider the object sought to be accomplished by its adoption, and the evils, if any, sought to be prevented or remedied, in light of the history of the times and the conditions and circumstances under which the provision was framed. Board of Comm'rs v. Department of Natural Resources, 496 So.2d 281 (La.1986); Stokes v. Harrison, 238 La. 343, 115 So.2d 373 (1959); In re Bankston, 306 So.2d 863 (La.App. 1st Cir.1974); Devlin, Privacy and Abortion Rights Under the Louisiana State Constitution: Could Roe v. Wade Be Alive and Well in the Bayou State, 51 La.L.Rev. 685, 689-690 (1991). The history of Article IV, § 16 indicates that the proponents of the 1921 constitutional provision recognized the importance of preserving the legal institution of forced heirship, especially its core principle of equality of heirship, in order to further significant social and economic interests.
To ensure the constitutional preservation of this civil law institution and principles, the spokespersons for this viewpoint introduced a proposal "relative to the limitation of legislative powers" to add a prohibition to the constitution that "[no] law shall be passed abolishing the principle of forced heirship or legalizing substitutions or fidei commissa or trusts affecting immovable property." Dainow, supra, 4 La.L.Rev. at 67. The proponents of this provision perceived the constitutional preservation of forced heirship and the principles it encompasses as a means of ensuring several important private and public policies: equitable distribution and equality of heirship among children; lessening of disputes, will contests and other wasteful litigation; harmony and solidarity of the family; and continued prevention of the cumulation of excessively large fortunes through primogeniture and entailment. See Spaht, Lorio, Picou, Samuel & Swaim, The New Forced Heirship Legislation: A regrettable "Revolution", 50 La.L.Rev. 409, 416 (1990); Le Van, Alternatives to Forced Heirship, 52 Tul. L.Rev. 29, 33 (1977); Daggett, General Principles of Succession on Death in Civil Law, 11 Tul.L.Rev. 399, 400-02 (1937).
Sidney L. Herold, the 1921 constitutional convention delegate who introduced the ordinance to limit the legislative powers, later explained the economic and social principles which its proponents sought to further by prohibiting the abolishment of forced heirship or the legalization of substitutions, fidei commissa or unlimited trusts:
"The most remarkable of the economic principles enunciated in the Civil Code, however, deals with the very current problem of the maldistribution of wealth and its unhealthy accumulation. Mindful of the evils in democracy, one of the great purposes of the Code is the prevention of this disease. The strict provisions of the Code governing the right of a testamentary disposition, in the institution of the doctrine of forced heirship and its elaborate provisions insuring equality of heirs, all flow from the same desire of obviating the possibility of the passing of great estates into single hands. The provision of the Code prohibiting fidei commissa and substitutions *1161 that is to say, the prohibition of trust estateswas likewise designed to keep in commerce the flow of wealth incident on death.
"So primogeniture, entailment, trust, and every other form through which fortunes might be held intact despite death are interdicted by the Civil Code of Louisiana. The agency of death thus performs its normal functionit releases the grasp of the possessor over worldly accumulation. It distributes, vests ownership and right of untrammeled disposition, breaks up the estate, and thus gives full play to the natural rule expressed in the homely proverb that it is but three generations from shirt-sleeves to shirt-sleeves. Thus the law does not stunt the natural instinct of acquisition nor interfere with the normal desire to accumulate for one's own posterity. It does not seek to confiscate nor to destroy. It simply says to the individual: `You have no natural right to retain the dead hand on your fortune. You must distribute and distribute in full ownership.'
"These threeforced heirship, equality of heirs, prevention of truststogether form a system of protection of democracy from too powerful wealth, which, if they had in effect in the nation from the period of the intensive industrial development since the Civil War, would have obviated the evils now sought to be remedied by more drastic means by national authority."
Dainow, supra, 4 La.L.Rev. at 68, n. 134 (quoting Herold, Handbook of the Association of American Law Schools for 1935, 84, 88-89).
This viewpoint clashed with that of those who had succeeded in having a limited trust device introduced into Louisiana law in 1920 and who believed that economic benefits would flow from expanding trusts and other estate planning devices. Dainow, supra, 4 La.L.Rev. at 67. See also, Nathan, An Assault on the Citadel: A Rejection of Forced Heirship, 52 Tul.L.Rev. 5 (1977); Lemann, In Defense of Forced Heirship, 52 Tul.L.Rev. 20 (1977).
Ultimately, an express limitation on legislative power was adopted which became Article IV, § 16 of the 1921 Louisiana Constitution, and provided:
No law shall be passed abolishing forced heirship or authorizing the creation of substitutions, fidei commissa or trust estates; except that the Legislature may authorize the creation of trust estates for a period not exceeding ten years after the death of the donor; provided that where a natural person is the direct beneficiary said period may be made to extend until ten years after his majority; and provided further, that this prohibition as to trust estates or fidei commissa shall not apply to donations strictly for educational, charitable or religious purposes.
La. Const. art. 4, § 16 (1921).
Thus more than a century after the first codification of Louisiana civil law, the appreciation of this legal system resulted in clothing one of its important institutions and the core principle of equality of heirship promoted by the institution with constitutional protection. The defenders of the civil law were forced to accept one compromise, however. Article IV, § 16 contained an explicit exception permitting the legislature to authorize the creation of trusts for educational, charitable, or religious purposes, and for private purposes for up to ten years after the death of the donor, extendable to ten years after the majority of the direct beneficiary. Nevertheless, subject to this limited exception for trusts, the constitutional provision clearly prohibited any law abolishing forced heirship or authorizing substitutions, fidei commissa, or trust estates.

C. Interpretation of Forced Heirship as a Constitutionally Protected Legal Institution and Individual Right of Inheritance
In cases arising under Article IV, § 16 of the Louisiana Constitution of 1921, our courts recognized that this specific limitation on the plenary power of the legislature prohibited the abolishment of forced heirship as a legal institution and guaranteed every individual a constitutionally enforceable right to a forced portion of his or her decedent's estate. Succession of Hyde, 292 So.2d 693 (La.1974); Succession of Gambino, 225 La. *1162 674, 73 So.2d 800 (1954); Succession of Thomson, 221 La. 791, 60 So.2d 411 (1952); Succession of Earhart, 220 La. 817, 57 So.2d 695 (1952); Succession of Guerre, 197 So.2d 738 (La.App. 4th Cir.), writ denied, 250 La. 928, 929, 933, 199 So.2d 925, 926 (1967); State ex rel. Muslow v. Louisiana Oil Refining Corp., 176 So. 686 (La.App. 2d Cir.1937); Akin v. Louisiana Nat'l Bank, 322 F.2d 749 (5th Cir.1963). See also cases recognizing that Article IV, § 16 constitutionally excluded or limited the legislature's power to create substitutions, fidei commissa, and trust estates. Pires v. Youree, 170 La. 986, 129 So. 552 (1930); Daugherty v. Canal Bank & Trust Co., 154 So. 681 (La.App. 1st Cir.), rev'd in part on other grounds, 180 La. 1003, 158 So. 366 (1934); Hart v. Mechanics & Traders Ins. Co., 46 F.Supp. 166 (W.D.La. 1942).
In Succession of Guerre, 197 So.2d at 743-44, for example, the court of appeal held that a parent's attempt to circumvent his child's constitutional right as a forced heir by converting his estate into United States savings bonds would not defeat the child's action for reduction of excessive donations, and stated:
There is no right more sacred in our laws than the right of a forced heir to inherit no less than a fixed minimum, which we call the legitime. This right is so deeply ingrained in our civil law that it has been declared in the Constitution of Louisiana in Article IV, Section 16, thus protecting it from the risk of legislative infringement. We must agree that a child has no vested right in his parent's property during the lifetime of the parent, but he has a constitutionally vested right of inheritance to not less than a fixed portion of his parent's property.
By the same token, this court in Succession of Thomson, 221 La. 791, 60 So.2d 411 (1952) enforced an adopted child's forced heirship claim and held that an adoptive parent and child cannot by contract abrogate the relationship existing between them. The court concluded:
Under the constitution of this state, no law can be passed abolishing forced heirship and children lawfully adopted have the same rights in the successions of persons adopting them as children who are forced heirs. Section 15 [sic], Article 4 of the Constitution of 1921. Id. at 800, 60 So.2d at 414.
Bequests in wills constituting prohibited substitutions were held to be invalid because they violated constitutional and statutory provisions. Succession of Guillory 232 La. 213, 94 So.2d 38 (1957) ("The bequest is clearly a prohibited substitution, and, as such, violative of the public policy of this state as expressed in our basic and statutory law, Section 16 of the Fourth Article of the Constitution of 1921...." Id. at 217, 94 So.2d at 39); Succession of Meadors, 135 So.2d 679 (La.App. 2d Cir.1961).
On the other hand, Article IV, § 16 contained an exception that proved the rule by allowing the legislature to authorize the creation of trusts for educational, charitable, or religious purposes, and the creation for private purposes of trusts with limited terms. Accordingly, laws authorizing trusts meeting these criteria were held to be enforceable and not in violation of Article IV, § 16. Succession of Earhart, 220 La. 817, 57 So.2d 695 (1952) (will established a private trust estate for ten years); Succession of Maguire, 228 La. 1096, 85 So.2d 4 (1955) (educational and charitable trust); Voisin v. Luke, 341 So.2d 6 (La.App. 1st Cir.1976), writ denied, 342 So.2d 224 (1977) (private trust); Pires v. Youree, 170 La. 986, 129 So. 552 (1930) (charitable trust).
Jurists and scholars alike recognized the strong, "almost sacred," constitutional policy favoring forced heirship not only because it was a socially desirable instrument to avoid excessive concentration of wealth but also due to its being the most efficient means of protecting children from unjust disinheritance and of promoting equitable distribution and equality in the family. Akin v. Louisiana Nat'l Bank of Baton Rouge, 322 F.2d 749, 756, (5th Cir.1963) (Wisdom, J.) (citing Dainow, Forced Heirship in French Law, 2 La.L.Rev. 669 (1940); Dainow, supra, 4 La. L.Rev. 42; Daggett, supra, 11 Tul.L.Rev. at 399-401 ("Forced heirship ... remains as a bulwark of equality for the family and is a known and accepted method for wealth distribution.").
*1163 The legislature itself recognized and respected the rights of individuals to forced heirship and the limitation upon its power to legislate with respect to the legal institution. Between 1921 and 1962 the legislature proposed several amendments to Article IV, § 16 of the 1921 Louisiana Constitution. The legislature on two occasions sought and obtained the voters' approval of amendments to relax the limitation on its power to authorize trust estates. See 1962 La. Acts, No. 521, adopted November 6, 1962, granting the legislature the power to authorize the creation of substitutions in trust and to place a forced heir's legitime in trust. See 1952 La. Acts, No. 208, § 1, adopted November 4, 1952, expanding the terms and purposes for which the legislature could authorize trusts. In two other instances the legislature successfully proposed amendments to Article IV, § 16 expanding adopted persons' rights to forced heirship. See 1958 La. Acts, No. 548, adopted November 4, 1958; 1944 La. Acts, No. 318, adopted November 7, 1944. In proposing each of these amendments the legislature properly and correctly recognized the constitutional rights and limits created by Article IV, § 16 of the 1921 Constitution.
It was the judgment of knowledgeable commentators, however, that Article IV, § 16 did not go so far as to petrify in detail each and every statutory forced heirship rule or procedure in effect in 1921. Rather, there was solidarity in belief that Article IV, § 16 allowed the legislature reasonable latitude to pass laws regulating and implementing the legal institution of forced heirship. Tucker, Substitutions, Fideicommissa and Trusts in Louisiana Law: A Semantical Reappraisal, 24 La.L.Rev. 439, 473 (1964); Le Van, supra, 52 Tul.L.Rev. at 48; Lemann, supra, 52 Tul. L.Rev. at 27; Comment, Forced Heirs, The Legitime and Loss of the Legitime in Louisiana, 37 Tul.L.Rev. 710, 722 (1963); O'Quin, Bench and BarOur Trust Estates and Their Limitations, 22 Tul.L.Rev. 585, 586 (1948); See Succession of Earhart, 220 La. 817, 57 So.2d 695 (1952) (Dictum: "This provision does not prohibit the legislature from regulating or restricting the rights of forced heirs." Id. at 825, 57 So.2d at 697). Undoubtedly, the jurists assumed that the constitutional provision incorporated the tradition of the legislature regulating forced heirship by adjusting the disposable portion and the causes of disinherison as it had prior to the adoption of the 1921 Louisiana Constitution and its Article IV, § 16. See 1972 Compiled Edition of the Civil Codes of Louisiana (Dainow ed. 1973) La.Civ.Code of 1808, arts. 19 and 130, at 212, 236; La.Civ.Code of 1825, arts. 1480 and 1613; La.Civ.Code of 1870, arts. 1493 and 1621.

D. Conclusions
Considering the social, economic, and moral objectives sought by the adoption of Article IV, § 16 of the 1921 Louisiana Constitution, and its interpretation by the courts, commentators, and legislature, we conclude, that the constitutional provision guaranteed every child equality of heirship in a forced portion of his or her decedent's estate, both as an individual constitutional right and as a principle of public policy in furthering the state interests in warding off intra-family litigation, promoting family solidarity, and preventing excessive concentrations of wealth. Consequently, the legislature could regulate and implement the legal institution of forced heirship subject to and consistently with these rights, principles, and purposes, for example by passing laws to set the exact amount of a reasonable forced portion, establish just causes of disinherison, and formulate appropriate procedures for proof of heirship, disinherison, and reduction. Furthermore, Article IV, § 16's express limitation on legislative power was subject to a reservation of the legislature's power to authorize the creation of trust estates for purposes and within limits stated in the constitutional provision.
The Appellants suggest to the contrary, that, in effect, Article IV, § 16 of the 1921 Constitution, did not create or define any substantive rights or limitations; that, therefore, the legislature could have made whatever changes it wished to forced heirship, even radical changes in its basic principle, rights, and purpose. If there was any restriction on legislative power to alter the system, the Appellants contend, it would have been satisfied by any remnant the legislature deemed appropriate that plausibly could have been called "forced heirship." In *1164 other words, the Appellants postulate that, Article IV, § 16 of the 1921 Constitution meant nothing more than if it had said: Forced heirship shall be defined by and regulated by the legislature.
For this proposition the Appellants rely almost entirely on language in Succession of Earhart, 220 La. 817, 57 So.2d 695 (La.1952). The argument is not persuasive. The statement relied upon is dictum. The interpretation the Appellants attribute to the constitutional provision leads to absurd consequences and clearly does not conform to its purpose, history, and interpretation by the courts, commentators, and the legislature.
In Succession of Earhart, id., a surviving child and forced heir of a decedent attacked the validity of a portion of his will establishing a trust for a period of ten years on the residue of decedent's estate. The heir contended that the decedent was prohibited by Article IV, § 16 of the 1921 Constitution from depriving forced heirs of immediate possession of the legitime. This court held that the trust established by decedent's will fell within the exception to the Article IV, § 16 prohibition against abolishment of forced heirship which reserved to the legislature the power to authorize the creation of trust estates for a period not to exceed ten years after the death of the donor.
After this holding, however, the court unnecessarily added an observation having no logical nexus with the case before it: "The words, `no law shall be passed abolishing forced heirship,' mean exactly what they say, in other words, that forced heirship cannot be done away with wholly, wiped out or destroyed." Id. at 824, 57 So.2d at 697. Because the court had already decided that the trust in question was authorized by a law the constitution expressly reserved legislative power to enact, the opinion's sweeping hyperbole was clearly not necessary. The statement fits well within a classical definition of dictum as "a statement in a judicial opinion that could have been deleted without impairing the analytical foundations of the holdingthat, being peripheral, may not have received the full and careful consideration of the court that uttered it." Sarnoff v. American Home Products, Corp., 798 F.2d 1075, 1084 (7th Cir.1986) (Posner, J.); quoted in Garner, A Dictionary of Modern Legal Usage 185 (1987).
Moreover, the interpretation of Article IV, § 16 that Appellants contend was suggested by the dictum in Succession of Earhart is incorrect and leads to absurd consequences. It would reduce a clear, specific constitutional prohibition or limitation on the power of the legislature to nothing more than a request or recommendation that the legislature impose limits upon itself when dealing with forced heirship. Also, this interpretation is antagonistic to the purpose of Article IV, § 16, as reflected by its history, which was to prevent the legislature from destroying the basic principle of forced heirshipequality of heirship among children to a forced portion of their decedent's estatethat in turn furthers the state's interest in preventing and remedying the evils of intra-family dissension and litigation, and excessive concentrations of wealth. Finally, the interpretation urged by Appellants based on a single judicial dictum is anomalous and conflicts with the interpretation of Article IV, § 16 by the courts, commentators, and the legislature during the life of that provision from 1921 through 1974, as set forth earlier in this opinion.

II. The Right of Forced Heirship Under Article XII, § 5 of the 1974 Louisiana Constitution

A. Overview of Principles and Conclusions
Article XII, § 5 of the 1974 Louisiana Constitution, the General Provision on Forced Heirship and Trusts, provides:
No law shall abolish forced heirship. The determination of forced heirs, the amount of the forced portion, and the grounds for disinherison shall be provided by law. Trusts may be authorized by law, and a forced portion may be placed in trust.
The function of the court, in construing a constitutional provision, is to ascertain and give effect to the intent of the people who adopted it. Before ratification, the draft constitution of 1974 was a mere proposal, without force or effect. The political act that made the constitution of 1974 binding was *1165 the vote of the people; it is the understanding that can be reasonably ascribed to that voting population as a whole that controls. Devlin, supra, 51 La.L.Rev. at 689-90; see City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Board of Comm'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281 (La.1986); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); Chehardy v. Democratic Executive Comm., 259 La. 45, 249 So.2d 196 (1971). As Chief Justice Marshall said of the federal constitution, "[t]he people made the Constitution, and the people can unmake it. It is the creature of their own will, and lives only by their will." Cohens v. Virginia, 6 Wheaton (19 U.S.) 264, 389, 5 L.Ed. 257 (1821)
In general, the constitution is subject to the same rules as other laws and written instruments. When a constitutional provision is clear and unambiguous, and its application does not lead to absurd consequences, it must be applied as written without further interpretation in search of its intent. Every provision must be interpreted in light of the purpose of the provision and the interests it furthers and resolves. When a constitutional provision is identical or very similar to that of a former constitution, it is presumed that the same interpretation will be given to it as was attributed to the former provision. Because the question is how the constitution was understood by the people adopting it, not merely how it was viewed by the drafters, the debates of a convention, as a general rule, cannot be resorted to for the purpose of varying the otherwise clear and unambiguous meaning of a constitutional provision.
See: (i) clear and unambiguous: Aguillard v. Treen, 440 So.2d 704 (La.1983); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); City of Baton Rouge v. Short, 345 So.2d 37 (La.1977); State v. Bradford, 242 La. 1095, 141 So.2d 378 (1961) (on rehearing); La.Civ.Code art. 9; (ii) whole provision: Hoppe v. City of Shreveport, 340 So.2d 1314 (La.1976); Barnett v. Develle, 289 So.2d 129 (La.1974); Central Louisiana Elec. Co. v. Louisiana Public Serv. Comm'n, 251 La. 532, 205 So.2d 389 (1967); Antoine v. Consolidated-Vultee Aircraft Corp., 217 La. 251, 46 So.2d 260 (1950); Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946); In re Bankston, 306 So.2d 863 (La.App. 1st Cir.1974); La.Civ.Code art. 13; (iii) similar to former provision: State v. Schneller, 199 La. 811, 7 So.2d 66 (1942); Kuhn v. Louisiana Highway Comm'n, 174 La. 990, 142 So. 149 (1932); State v. Glenn, 153 La. 147, 95 So. 534 (1922); State ex rel. L.B. Da Ponte v. Board of Assessors, 35 La.Ann. 651 (1883); Dickie's Sportsman's Centers, Inc. v. Department of Transp. & Dev., 477 So.2d 744 (La.App. 1st Cir.), writ denied, 478 So.2d 530 (1985); State ex rel. Cox, 461 So.2d 658 (La.App. 1st Cir.1984), writ denied 464 So.2d 1375 (1985); Brasseaux v. Vermillion Parish Police Jury, 361 So.2d 35 (La.App. 3d Cir.), writ denied, 363 So.2d 535 (1978); (iv) convention debates not used to vary clear meaning: Cajun Elec. Power v. Louisiana Public Serv. Comm'n, 544 So.2d 362 (La.1989), cert denied, 493 U.S. 991, 110 S.Ct. 538, 107 L.Ed.2d 536 (1989); City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); La.Civ.Code art. 9.
Applying these principles, we conclude that (1) when Article XII, § 5 is read as a whole it clearly and unambiguously places a prohibition or express limitation on the power of the legislature to pass laws abolishing forced heirship; (2) Article XII, § 5 does not reserve to the legislature the power to define the limits of its own power; rather, it is the prerogative of this court as the final arbiter of the meaning of the constitution and laws of this state to interpret and mark the contour of that limitation on legislative power; (3) because the provisions of Article XII, § 5 are identical or very similar to the provisions and jurisprudential construction of Article IV, § 16 of the 1921 Constitution, Article XII, § 5 must be interpreted to guarantee the same individual constitutional rights and principle of public policy, and to have the purpose of furthering the same state interests, as did the former constitutional provision; thus (4) amended Civil Code article 1493 is unconstitutional because *1166 it violates Article XII, § 5 by depriving the plaintiffs of their individual rights, purporting to abolish the constitutional principle of equality of heirship and render forced heirship wholly ineffective to further its constitutional purposes, and by purporting to abolish as a constitutionally guaranteed right the right of every child to participate in a forced portion of his or her decedent's estate.

B. Elaboration of Principles and Interpretation of Constitutional Provision

1.
It is a fundamental principle of constitutional construction that when a provision is clear and unambiguous it should be applied as written. Aguillard v. Treen, 440 So.2d 704 (La.1983); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); City of Baton Rouge v. Short, 345 So.2d 37 (La. 1977); State v. Bradford, 242 La. 1095, 1119, 141 So.2d 378, 386 (1961) (On rehearing, McCaleb, J.). Accordingly, effect should be given to the purpose indicated by a fair interpretation of the language used, and that construction which effectuates, rather than that which destroys a plain intent or purpose of a constitutional provision, is not only favored but will be adopted. Board of Comm'rs v. Department of Natural Resources, 496 So.2d 281 (La.1986); Barnett v. Develle, 289 So.2d 129 (La.1974); Stokes v. Harrison, 238 La. 343, 115 So.2d 373 (1959); In re Bankston, 306 So.2d 863 (La.App. 1st Cir.1974).
In ascertaining both the intent and general purpose, as well as the meaning, of a constitution, or a part thereof, it should be construed as a whole. Antoine v. Consolidated-Vultee Aircraft Corp., 217 La. 251, 46 So.2d 260 (1950). As far as possible, all provisions should be construed together so as to harmonize in their application, if possible, with a view to giving effect to each and every provision insofar as it shall be consistent with a construction of the instrument as a whole. Barnett v. Develle, 289 So.2d 129 (La.1974); Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946); Central Louisiana Elec. Co. v. Louisiana Public Serv. Comm'n., 251 La. 532, 205 So.2d 389 (1967); In re Bankston, 306 So.2d 863 (La.App. 1st Cir.1974).
Insofar as the general purpose of Article XII, § 5 is concerned, its text and meaning are clear according to a fair and reasonable interpretation of the provision as a whole. The general purpose of Article XII, § 5 is to afford constitutional protection to the legal institution of forced heirship in order to recognize and protect the interests of individuals and to further important state interests. Consequently, in our opinion, the first sentence of Article XII, § 5 ("No law shall abolish forced heirship.") clearly and explicitly indicates the purpose of the constitutional provision. The second sentence ("The determination of forced heirs, the amount of the forced portion, and the grounds for disinherison shall be provided by law.") must be construed as having a meaning that best conforms to this purpose. Otherwise, the express limitation upon the power of the legislature, prohibiting the abolishment of forced heirship, would have no purpose or effect and would not be given equal dignity with the other parts of the provision. This would be contrary to our decisions holding that every clause in a written constitution is presumed to have been inserted for some useful purpose, and courts should avoid a construction which would render any portion of the constitution meaningless. Barnett v. Develle, 289 So.2d 129 (La.1974); Meyers v. Flournoy, 209 La. 812, 25 So.2d 601 (1946). Furthermore, our customary rules of constitutional and statutory interpretation require that different provisions relating to the same subject matter must be interpreted in the light of each other. Hoppe v. City of Shreveport, 340 So.2d 1314 (La.1976); Antoine v. Consolidated-Vultee Aircraft Corp., 217 La. 251, 46 So.2d 260 (1950); La.Civ.Code art. 13.
Accordingly, it is our duty to give to Article XII, § 5 that construction which effectuates, rather than that which destroys its purpose as an express limitation upon the otherwise plenary power of the legislature. Therefore, the power reserved to the legislature to pass laws relating to forced heirs, the forced portion, and disinherison is subordinate, ancillary, or supplementary to the purpose of preventing the abolishment of forced heirship. Otherwise, the legislature under the guise of enacting such laws could *1167 render the legal institution of forced heirship wholly ineffective or inactive; thus, the purpose of Article XII, § 5 would be destroyed rather than effectuated by a construction permitting such legislation.

2.
This court is the final arbiter of the meaning of the state constitution and laws. La. Const. art. V, § 1; State v. Perry, 610 So.2d 746, 751 (La.1992); Jefferson Lake Sulphur Co. v. State, 213 La. 1, 34 So.2d 331 (1948); State through the Dept. of Highways v. Constant, 359 So.2d 666 (La.App. 1st Cir.1978), affirmed, 369 So.2d 699 (La.1979). See Michigan v. Long, 463 U.S. 1032, 1040, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201 (1983); Friesen, State Constitutional Law, §§ 1.03[2], 1.07 (1992); Linde, E. Pluribus Constitutional Theory and State Courts, 18 Ga.L.Rev. 165; Developments in the Law: The Interpretation of State Constitutional Rights, 95 Harv.L.Rev. 1324, 1331-67 (1982); Devlin, supra, 51 La.L.Rev. at 7. Therefore, the second sentence of Article XII, § 5 recognizing the power of the legislature to pass certain forced heirship laws within the boundaries set by the constitution does not by any means authorize the legislature to set the limits upon its own power. It is the exclusive prerogative of this court to interpret and trace out the bounds or limits of the residual legislative power under Article XII, § 5.

3.
It also is a well established rule of constitutional construction that where a constitutional provision similar or identical to that used in a prior constitution is adopted, it is presumed such provision was adopted with the construction previously placed on it by the jurisprudence. See State v. Schneller, 199 La. 811, 7 So.2d 66 (1942); Kuhn v. Louisiana Highway Comm'n, 174 La. 990, 142 So. 149 (1932); State v. Glenn, 153 La. 147, 95 So. 534 (1922); State ex rel. L.B. Da Ponte v. Board of Assessors, 35 La.Ann. 651 (1883); Dickie's Sportsman's Centers, Inc. v. Department of Transp. & Dev., 477 So.2d 744 (La.App. 1st Cir.), writ denied, 478 So.2d 530 (1985); State ex rel. Cox, 461 So.2d 658 (La. App. 1st Cir.1984), writ denied, 464 So.2d 1375 (1985); Brasseaux v. Vermillion Parish Police Jury, 361 So.2d 35 (La.App. 3d Cir.), writ denied, 363 So.2d 535 (1978).
After comparing the provisions of Article XII, § 5 with that of its source, Article IV, § 16 of the 1921 Constitution, we conclude that they are so similar that the essential elements of the source provisions were adopted with the construction previously placed on them by the jurisprudence. Article XII, § 5 is entitled "Forced Heirship and Trusts." The first sentence of Article XII, § 5 ("No law shall abolish forced heirship.") is virtually identical to that pertinent part of the 1921 constitutional provision: "No law shall be passed abolishing forced heirship * * *." The second sentence of Article XII, § 5 ("The determination of forced heirs, the amount of the forced portion, and the grounds for disinherison shall be provided by law.") is similar to the jurisprudential gloss on the 1921 provision to the effect that the legislature may implement and regulate forced heirship subject to and not inconsistent with the core principle and right of equality of heirship for children. This further confirms that Article XII, § 5 adopted the correspondingly similar elements of its source provision along with the prior jurisprudential interpretations of them. The third sentence of Article XII, § 5 is simply a continuation of the exception to the prohibition on the abolishment of forced heirship reserving legislative power to authorize trust estates.
Consequently, we conclude that Article XII, § 5 essentially continues the meaning of the provisions of Article IV, § 16 of the 1921 Constitution as they had been interpreted by the courts, commentators, and the legislature. We are not persuaded by the argument that, because the second sentence of Article XII, § 5 was not expressly included in the source provision, its appearance in the 1974 Constitution signalled a change in the law. The wording of the second sentence and its placement make it so similar to the idea that the legislature may implement and regulate laws without changing the basic principle, right, and purpose of forced heirship that it is difficult to read into it an intention to make any major change in the law. If there had been any intention to *1168 empower the legislature to abrogate the fundamental principle and right of every child to equality of heirship in a forced portion of his or her decedent's estate, the document would have either explicitly so stated or would have omitted any mention of a forced heirship guarantee altogether. Furthermore, as we observed earlier, the second sentence's provision occupies a subordinate position following the first sentence's clear, explicit statement of Article XII, § 5's constitutional purpose an express limitation on legislative power without which there would have been no point in including any of its three sentences in the constitution. Therefore, the second sentence may be construed reasonably only as a provision that makes explicit the jurisprudential interpretation that had been placed on the source provision, viz., that the legislative function is to mould and implement the legal institution of forced heirship without thwarting or destroying the fundamental and enduring rights, principle, or purposes that it encompasses. As five of the leading forced heirship commentators have observed, "the constitutional provision allowing the legislature to determine forced heirs, the amount of the forced portion, and the grounds of disinheritance is not an invitation to destroy the concept, but a grant of flexibility within the confines of the institution of forced heirship." Spaht, Lorio, Picou, Samuel & Swaim, supra, 50 La.L.Rev. at 414.

4.
Appellants argue that this court should turn to the constitutional convention debates in interpreting Article XII, § 5; and that in doing so we should conclude that the constitutional provision was intended to empower the legislature to define forced heirship in any manner that it deems appropriate. We disagree with both arguments. When a constitutional provision is clear and unambiguous, it should be applied as written and no further interpretation made in search of the constitutional intent. Cajun Elec. Power v. Louisiana Public Serv. Comm'n, 544 So.2d 362 (La.1989), cert. denied, 493 U.S. 991, 110 S.Ct. 538 (1989); City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); See also La.Civ.Code art. 9.
Because the question in interpreting a constitution is how it was understood by the people adopting it, not merely how it was viewed by the drafters, the debates of a convention as a general rule should not be resorted to for the purpose of overruling a plain provision. Devlin, supra, 51 La.L.Rev. at 689-90; See City of New Orleans v. Scramuzza, 507 So.2d 215 (La.1987); Board of Comm'rs of Orleans Levee Dist. v. Department of Natural Resources, 496 So.2d 281 (La.1986); Bank of New Orleans & Trust Co. v. Seavey, 383 So.2d 354 (La.1980); Chehardy v. Democratic Executive Comm., 259 La. 45, 249 So.2d 196 (1971). See also Household Finance Corp. v. Shaffner, 356 Mo. 808, 203 S.W.2d 734 (1947); State ex rel. Russell v. State Highway Comm., 328 Mo. 942, 42 S.W.2d 196 (1931); McCulley v. State, 53 S.W.2d 134 (Tenn.1899); Scribner v. State, 9 Okl.Cr. 465, 132 P. 933 (1913); Cooley, Constitutional Limitation 143 (8th ed. 1927). We have concluded that the constitutional intent of Article XII, § 5 is clear, in view of the history, purpose, and jurisprudential interpretation of its source provision, and that the legislature is powerless to pass a law that abolishes or renders wholly ineffective the essential principle and purposes for which the legal institution of forced heirship was elevated to constitutional status. Consequently, the proceedings and debates of the constitutional convention may not be referred to for the purpose of varying this clear constitutional aim. Cajun Elec. Power, 544 So.2d 362; City of New Orleans, 507 So.2d 215; Bank of New Orleans, 383 So.2d 354.
Furthermore, aside from the fact that the convention debates can not be used to vary the clear intent of a constitutional provision, convention and legislative debates often furnish an uncertain and unreliable guide in the interpretation of constitutions and laws and may be of little value as expressions of the view of the convention as a whole. Frequently no one expresses the views of those by whose votes a measure of importance is passed. Many delegates who vote for a provision may be satisfied to vote without discussion, but if one or more does join in the debate, it does not follow that their interpretation or opinion expresses the view of the *1169 convention as a whole. See West v. Allen, 375 So.2d 758 (La.App. 4th Cir.1979), rev'd on other grounds, 382 So.2d 924 (La.1980). See also United States v. O'Brien, 391 U.S. 367, 384, 88 S.Ct. 1673, 1683, 20 L.Ed.2d 672 (1968); United States v. Trans-Missouri Freight Ass'n, 166 U.S. 290, 17 S.Ct. 540, 41 L.Ed. 1007 (1897); Funkhouser v. Spahr, 102 Va. 306, 46 S.E. 378 (1904); McCulley v. State, 53 S.W. 134 (Tenn.1899); People v. McCreery, 34 Cal. 432 (1868); Scribner v. State, 9 Okl.Cr. 465, 132 P. 933, 934 (Okla.Ct. Cr.App.1913); Cooley, Constitutional Limitation 143 (8th ed. 1927).
Moreover, the debates confirm the clear meaning of Article XII, § 5 that we have derived from the provision itself and the history, purpose, and jurisprudential interpretation of the corresponding provision of the former constitution. If it had been the drafters' object to subject the legal institution of forced heirship to the plenary power of the legislature, as the Appellants contend, the convention could have done so simply by omitting any provision regarding forced heirship from the constitution. When such an opportunity was presented by a delegate's proposed amendment, however, the convention soundly rejected it by a vote of 93 to 11. The delegates' remarks during the brief debate on the forced heirship provision do not support the Appellants' argument. Of the fourteen delegates who spoke on this subject, only four expressed opposition to retaining a constitutional limitation of the legislature's power to enact laws with respect to forced heirship. No delegate stated or even suggested that the proposed provision would allow the legislature to destroy or impair the core principle of equality of heirship among children in the legitime or to defeat the purposes of promoting family unity, deterrence of litigation and dispersion of excessive accumulation of wealth. On the contrary, the prevailing sense of the remarks of the delegates was that the provision which ultimately became Article XII, § 5 of the 1974 Louisiana Constitution would continue the same express limitation upon legislative power that had been provided for by Article IV, § 16 of the 1921 Louisiana Constitution. State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, Vol. IX, 107th Day ProceedingsJanuary 3, 1974 (see e.g., statements of delegates Burson at 3076, Dennery at 3077-78, Stinson at 3073, 3076 & Smith at 3076). See appendix for transcript of convention debates regarding Article XII, § 5.

C. Application of the Constitutional Provision to the Present Case and the Law in Question
Amended Article 1493, in pertinent part, purports to redefine "forced heirs" to include only "descendants of the first degree who have not attained the age of twenty-three years, or any age who, because of mental incapacity or physical infirmity, are incapable of taking care of their persons or administering their estates." In other words, the Article purports to repeal or extinguish the right of forced heirship of every child who is competent and 23 years of age on the date of his or her decedent's death. Applying the provisions of Article XII, § 5 to amended Article 1493, we conclude that the law violates the constitutional provision in several mutually involved respects.
First, amended Article 1493 violates Article XII, § 5 of the 1974 Louisiana Constitution because it purports to deprive each plaintiff of his individual right as a child to an equal share of a forced portion of his decedent's estate. As we have observed, the courts, commentators, and the legislature recognized that such an individual constitutional right was created by Article IV, § 16 of the 1921 Louisiana Constitution. Thus, it was established under the former constitution that the safeguard of forced heirship embraced both the individual child's interest in dignity and equality of treatment within the family and his or her personal economic interest in inheriting a forced share of a fixed portion of the family estate. These concerns are inextricably related: a legally assured right to share equally in the legitime is an important cornerstone to an individual's relations of the most fundamental sortfamilial respect, dignity, love, and trust. Amended Article 1493 violates the plaintiffs' rights to an equal forced share of their decedent's estate and defeats their interests in treatment as equals within their family.
*1170 This court recognized in Succession of Clivens, 426 So.2d 585, 593 (La.1982) (Calogero, J., on rehearing), that Article XII, § 5 of the 1974 Louisiana Constitution continues the guarantee to every child of the individual right of an equal share in a forced portion of his or her decedent's estate: "Because of the unique nature of Louisiana succession law, which constitutionally requires forced heirship (La. Const. art. XII, § 5), a testator is not free to bequeath all his property to whomever he pleases if he leaves descendants. Descendants have a constitutional, as well as a statutory, right to a forced portion." Id. at 598. That each child is constitutionally guaranteed a right to equal participation in a forced portion of his decedent's succession has been acknowledged repeatedly by this and other courts. Succession of Bartie, 472 So.2d 578 (La.1985); Succession of Levy, 428 So.2d 904 (La.App. 1st Cir.1983), overruled on other grounds by Griffin v. Succession of Branch, 452 So.2d 344 (La.App. 1st Cir.1984). See also, Succession of Landry, 463 So.2d 681 (La.App. 4th Cir.1985).
Furthermore, amended Civil Code article 1493, if it were to be given authoritative approval by this court, would effectively abolish forced heirship as a constitutional right for all children, even for those who are under 23 years or incompetent at the time of their decedents' deaths. For, if the legislature could by a simple majority vote disfranchise virtually all competent adult children by the present law, it could extinguish the forced heirship right of other classes of children by future laws. Evidently, therefore, the legislature would even be free to adopt a law such as the Uniform Probate Code, which provides only the surviving spouse with a forced share of the decedent's estate. Uniform Probate Code, Art II, pt. 2 (1982). For these reasons, we conclude that amended Article 1493 is invalid, not only because it violates the individual constitutional rights of the plaintiffs and other children who are 23 years of age and competent upon the date of their decedent's death, but also because it purports to abolish forced heirship as a constitutionally protected right for all children.
Second, amended Article 1493 of the Civil Code is unconstitutional because it purports to abrogate the core principle of equality of heirship in the legitime among children of a family. Article IV, § 16 of the 1921 Constitution was originally adopted for the purpose of maintaining this principle against possible legislative infringement because of the public and private good that it promotes. Those who placed the provision in our state charter valued the principle of equality of heirship both as an end and as a means. And it has been so interpreted, both as a means to social and economic endsdeconcentration of wealth, deterrence of litigation, and family harmonyand as an end in itself, the expression of children's individual rights to equality of heirship in a part of their decedents' estates, reflecting the sort of society we wish to be and the dignity we wish to accord each individual. If amended Article 1493 were to be upheld as a valid law, virtually all testators would be granted complete testamentary freedom for the first time in our almost 300 year old legal history. The core principle of equality of heirship would be abolished. The practices of unjust disinheritance or discrimination, primogeniture, and entailment would be permitted. Each child would no longer be guaranteed treatment as an equal within his or her family or assured of an equitable distribution from a forced portion of his or her decedent's estate.
Third, the law is unconstitutional because it abolishes or renders wholly ineffective the legal institution of forced heirship to serve the purposes intended by the constitutional limitation upon legislative power. The purpose of the prohibition on the abolishment of forced heirship was to guarantee the principle of treatment as equals in heirship in order to further important social and economic goals, viz., elimination of intra-family litigation; promotion of family harmony, strength, and solidarity; and prevention of excessive concentrations of wealth. If amended Article 1493 were to be given effect, each of these purposes of the constitutional provision would be thwarted. By the same token, each of the evils that the prohibition on the legislative power to abolish forced heirship was designed to combat would be incited and fomented, viz., family animosity and rancor that results from unjust disinheritance and unequal treatment of children; increased *1171 intra-family litigation resulting in pernicious and deleterious effects upon families; and the impairment to society that results from the concentration of wealth through the retention of family estates by only a few.
The proponents of amended Article 1493 cannot dispute that the law, if given effect, would deprive the plaintiffs and virtually all adult children of their individual rights to treatment as equals in forced heirship, deprive all children of forced heirship as a constitutional right, abrogate the principle of equality of heirship, and abolish or render wholly ineffective forced heirship to serve the purposes for which the constitutional provision was adopted. Instead, they contend that the law does not abolish forced heirship because the legislature saw fit to leave intact a vestigial remnant of the former legal institution. Their argument is without merit.
First, the argument is based on the false assumption that the legislature has the power to interpret the core principle and purposes of the constitutional provision differently from the intention of the drafters and the ratifiers as interpreted by this court. Clearly, the legislature is powerless to reinterpret a constitutional limitation upon its own power so as to allow it to thwart the very principle and purposes that the constitution protects against legislative infringement. Moreover, it is equally clear that the legislature is powerless to abolish by ordinary acts the individual rights of persons that this court determines to have been expressly or impliedly guaranteed by the constitution.
Second, the argument is specious even on its own terms, which mistakenly construe the prohibition on the abolishment of heirship as a one-dimensional mathematical rule, rather than as a statement of constitutional objectives. The "protected class" which amended Article 1493 purports to set up in order to support its cramped concept of "forced heirship" is wholly illusory. Rarely does a child have a parent die testate before he or she reaches the age of 23; even fewer, if any, children who are incompetent or under 23 at the time of their parent's death will be disinherited and left in actual destitution. In other jurisdictions, when a parent dies testate leaving nothing to a minor, it is usually because the testator expects the surviving parent, whom he has provided for, to protect and nurture the child. Haskell, Restraints Upon the Disinheritance of Family 114 in Death, Taxes and Family Property (Halbach ed., 1977); Dunham, The Method, Process, and Frequency of Wealth Transmission at Death, 30 U. of Chi.L.Rev. 241, 257 (1963). Consequently, the minute amount of actual protection, if any, furnished by amended Article 1493 is de minimus and so insignificant that it cannot possibly be deemed to have any legal or constitutional weight. Therefore, amended Article 1493, even on its own mistaken terms, abolishes and renders defunct any form of forced heirship.

III. Separability
Civil Code article 1493, as amended, which purports to extinguish forced heirship for competent persons 23 years of age or older at the time of their decedent's death, is the product of two legislated laws, viz., Act No. 788 of 1989 and Act No. 147 of 1990. In the trial court, the Appellees challenged both laws as an unconstitutional redefinition and abolishment of forced heirship. The trial court in its written reasons agreed and clearly indicated in its opinion that both laws violated the state constitution. In its judgment, however, the trial court simply declared unconstitutional "the provisions of Louisiana Civil Code Article 1493 defining forced heirship." For the reasons assigned in this opinion, both legislative acts are unconstitutional because they purport to redefine forced heirs in a way that abolishes or renders wholly ineffective forced heirship. Accordingly, we will amend the trial court's judgment to declare unconstitutional Act No. 788 of 1989 and Act No. 147 of 1990, as well as the version of Civil Code article 1493 which resulted from those Acts.
In doing so, we have examined all of the provisions of the multipartite legislative acts to determine whether any part should be upheld as being separable from the invalid provisions. To be capable of separate enforcement, the valid portion of an enactment must be independent of the invalid portion and must form a complete act within *1172 itself. The law enforced after separation must be reasonable in light of the act as originally drafted. The test is whether the legislature would have passed the statute had it been presented with the invalid features removed. State v. Johnson, 343 So.2d 705 (La.1977). A further inquiry which courts make in determining legislative intent in regard to the separability of statutes is into the dominant or main purpose of the enactment. Where the purpose of the statute is defeated by the invalidity of part of the act, the entire act is void. Conversely, when the general object of the act can be achieved without the invalid part, the act will be upheld. State v. Johnson, id.; Roy v. Edwards, 294 So.2d 507 (La.1974); Gaudet v. Economical Super Market, 237 La. 1082, 112 So.2d 720 (1959); Pollitt v. Connick, 596 F.Supp. 261 (E.D.La. 1984); 2 Singer, Sutherland Statutory Construction, § 44.04, (Sands 4th ed., 1986) (citing copious authorities).
Applying these precepts, we conclude that both the 1989 and 1990 legislative acts must be declared unconstitutional in their entirety. The constitutionally flawed part of each act is the threshold provision which amends Civil Code article 1493 to redefine forced heirs as children under twenty-three years or of any age who are incapable of taking care of their persons or administering their estates. It is self-evident that the legislature would have passed few, if any, of the other parts of the acts but for the amendment to Article 1493 redefining forced heirs. The related provisions are concerned mainly with altering other existing articles to accommodate the new definition and with remedial measures for interpreting testaments executed prior to the final enactment of that unconstitutional definition. Furthermore, the invalidity of the redefinition of forced heirship clearly defeats the dominant or main purpose of both acts. Although Act No. 147 of 1990 included provisions of possible independent merit that would have repealed obsolete civil code articles pertaining to illegitimate children, these measures obviously were not major goals sought by the legislation. Therefore, the general object of neither act can be achieved without the invalid part that renders forced heirship wholly ineffective. Accordingly, the 1989 and 1990 acts are void.
For the reasons assigned, the judgment of the trial court is amended so as to declare unconstitutional Act No. 788 of 1989, Act No. 147 of 1990, and Civil Code article 1493 as amended by those Acts. As amended, the trial court judgment is affirmed.
AMENDED AND AFFIRMED.
WATSON, J., not on panel. Rule IV, Part 2, Section 3.
MARCUS, J., dissents and assigns reasons.
HALL, J., dissents for the reasons expressed by Justice KIMBALL and assigns additional reasons.
KIMBALL, J., dissents and assigns reasons.

Appendix

Records of the Louisiana Constitutional Convention of 1973: Convention Transcripts Volume IX

107th Days ProceedingsJanuary 3, 1974

Reading of the Section
MR. POYNTER
Section 7. Forced Heirship and Trusts
"Section 7. No law shall abolish forced heirship. The determination of forced heirs, and the amount of the forced portion, and the grounds for disinheritance shall be provided by law. Trusts may be authorized by law for any purpose and a legitime may be placed in trust."

Explanation
MR. STINSON
Fellow delegates, you have the brochure that was handed out. This makes very little change from the present provisions of the constitution, except it provides more that the legislature can set up what the forced portion shall be, what percentages as it is at the present time in the Civil Code. It guarantees though that the forced heirship shall not be abolished, that's in our present constitution. It has always been in the law of Louisiana. *1173 For someone that may not know what forced heirship is, that is, that your children cannot be, as in Texas, for example, be left a dollar or five dollars; they have a forced portion depending on the number of children. You have the right in Louisiana under the present law and under this to disown a child for certain reasons. It says that "the legislature shall set up such reasons." The reasons are: an attempt on the life of a parent or marriage of while a juvenile without authority, against their wishes, etc., but that is not in the constitution, it's in our laws that the legislature can change at any time. This is the basic law saying there will be forced heirship and to determine who the forced heirs are and the amount and the grounds for disinheritance shall be provided by law. In other words, by the legislature. It says, "Trusts may be authorized by law for any purpose." That's authorized in the legislature as it does at the present time. We have a trust code as you know, but there's no reason for putting it in the constitution. I think that covers this. If there are any questions, I'll be happy to try to answer them.

Question
MR. BURSON
Mr. Stinson, did you all have expressed to your committee a great deal of opinion from lawyers across the state on this provision?
MR. STINSON
Mr. Burson, we had resolutions from a great number of Bar Associations from the different parishes asking that it please be retained in the constitution as it is at the present time.
MR. BURSON
While I was president of the St. Landry Parish Bar Association, I know we passed such a resolution. Did you have any resolutions recommending that it be taken out from anyone that you can recall?
MR. STINSON
I don't recall that we did. I think all were in favor of it and urging us to retain it.
MR. FONTENOT
Mr. Stinson, I see there's no reference to the provisions which had in the old constitution which had to do with adopted children having the same rights as legitimate children. Why did you all leave that provision out of there?
MR. STINSON
Because it doesn't say even "children" it says "forced heirs" and the legislature will say who forced heirs are. In this section we don't even refer to children. It just says "forced heirs as shall be determined by the legislature."
MR. FONTENOT
But, in the old constitution adopted children, regardless of what the legislature says, have the same rights as legitimate children, yet, we're not saying that in this new constitution, the way I read it.
MR. STINSON
The committee felt that it shouldn't be in the constitution. Neither do they say that children will be forced heirs of fathers and mothers and their ascending line. It will be left up to the legislature.
MR. ABRAHAM
Mr. Stinson, going further with Mr. Burson's question. Did you have anyone appear before the committee recommending removal of this thing from the constitution from any particular people, not necessarily a resolution, but did any people appear to request that it be ...
MR. STINSON
We had one personsome misguided lawyer from New Orleans was there.
MR. ABRAHAM
You didn't have any people appear?
MR. STINSON
I'm not reflecting just the vote ...
MR. ABRAHAM
You didn't have any people appear; you only had lawyers appear?
MR. STINSON
No, sir. One attorney.
MR. ABRAHAM
No people though, just lawyers.
*1174 MR. STINSON
Well, he was ... he walked in; he was a person.
MR. AVANT
Ford, what I want to ask you is this: This sentence, "The determination of forced heirs and the amount of the forced portion and the grounds for disinheritance shall be provided by law." Now, what I want to know is this: In those situations where you have children of two marriagesand it happens quite frequentlyand you may have a second community between a man and his second wife or vice versa a woman and her second husband, where you have children by a previous marriage who are grown, you know the law is now that they are forced heirs, and you can't disinherit them and you can't even encumber their legitime with a usufruct as I understand the law. Now, under this section as it's written, would the legislature be permitted to provide that in those situations that a man could take care of his surviving spouse by leaving her the usufruct of his half of the community to the detriment of say his major children by another marriage that he may have had? Could the legislature do that?
MR. STINSON
I feel the legislature could, as they can under the present constitution.
MR. AVANT
You think they can do it under the present constitution?
MR. STINSON
If they change the Code Articles, yes.
MR. JENKINS
Mr. Ford, with regard to who was for this and who was against it. Isn't it true that our committee didn't receive maybe more than two or three resolutions from local Bar Associations wanting to retain forced heirship and that we didn't have but one person come and speak in favor of taking it out and probably, I don't remember any coming and speaking in favor of leaving forced heirship in; do you recall any?
MR. STINSON
Mr. Jenkins, I don't how many resolutions the committee received, but I received a numberthey were sent personally to the different members, I think.
MR. JENKINS
Isn't it true that we adopted this provision just a couple of weeks ago by way of amendment and there was no real advanced public notice so that there would have been no way that people could have come and testified one way or the other in advance because they had no idea it would be coming up; isn't that true?
MR. STINSON
Mr. Jenkins, I was not present at the last meeting that you referred to, but we had discussed it before at prior meetings when it was discussed in detail.
MR. JENKINS
One other question: Under the Right to Property Section in the Bill of Rights we had originally included in there the provision that laws regarding forced heirship could not be abolished, but do you recall that the convention deleted that requirement under the Right to Property in the Bill of Rights?
MR. STINSON
As I recall, it was the understanding it would be placed in another place in the constitution, as I recall.

Vice Chairman Casey in the Chair
MR. DENNERY
Mr. Stinson, isn't it correct that I introduced the amendment to remove the provisions concerning forced heirship with the understanding that I would introduce a delegate proposal concerning it?
MR. STINSON
As I recall, I think so, yes, Mr. Dennery.
MR. DENNERY
Wasn't that delegate proposal brought before your committee and as a result of that this was the section that was adopted?
MR. STINSON
That's correct, yes, sir.
MR. DENNERY
There were lawyers who appeared before your committee in favor of it.
MR. STINSON
Yes, sir.

*1175 Amendment
MR. POYNTER
Amendment sent up by Delegate O'Neill reads as follows:
"Amendment No. 1. On page 2, delete lines 9 through 14, both inclusive in their entirety."

Explanation
MR. O'NEILL
Ladies and gentlemen of the convention, as you heard in the question and answer session there was some debate even within the committee on whether or not this provision should be included in our new constitution or not. Contrary to what several delegates have said, I have been contacted by various counsels for the aged who have asked that these provisions on forced heirship be removed from the constitution so the legislature can provide for these things as it deems necessary. Now, I have some very strong personal feelings on the subject of property and what have you. I feel that a man ought to be able to do with his property as he wants. But, there is a strong opinion and I can see it and I could accommodate it that minor children should be provided for from the parents, and state, and what have you. I can accommodate that position. I think the convention needs to speak on this because of the great number of old people in our state who would like to see such provisions removed. I'm not an attorney, and I can't discuss and describe all the nuances of a state law and of forced heirship to know how property goes from one person to another. But, I do know that many injustices have been perpetrated upon people who do leave their property. The provisions in the Civil Code cover this matter quite clearly and I think that they would be sufficient in light of what has been done over the past. You know, this law evolves from the French people who were sort of the feudal lords. They had huge estates which they felt rightly should pass to their children. Well, I think we have come of age now to where those kinds of things don't happen; and those few people who have big estateswell, I would dare say that ninety percent of themwould care to leave them to their children anyway. I think the convention, as I said, does need to speak on this. I know that there are strong opinions and many divided opinions. I'll try to answer the questions as well as I can but, as I say, I don't know all the nuances of forced heirship so, please, bear with me if I don't know all the details.

Further Discussion
MR. SINGLETARY
Mr. Chairman, ladies and gentlemen, I rise in strong support of Mr. O'Neill's amendment. It may surprise you to know that when I was campaigning for this office, this is one of the most often raised questions from people, they just weren't happy with the situation. Presently, I think, the law is... contains many inequities. For instance, if the man remarries and has children by a prior marriage, if he writes a will to provide for his second wife, to provide for her security that will is no good and children by a prior marriage can come in and force that surviving spouse to sell that property and distribute the proceeds among the heirs. Likewise, if a man dies and has no descendants, if his parents are living they can come in and dispossess that man's wife. Whether you are for forced heirship or against it, I think it has no place in the constitution. We have previously provided that the legislature can pass laws providing for forced heirship in the Bill of Rights where we said that the legislature... that people have the right of ownership subject to reasonable regulations established by the legislature. I'm not sure, but I believe our constitutional provision requiring forced heirship at one time caused a constitutional amendment during the Huey Long era when it was feared that our state was losing a lot of money to other states because our citizens were going to other states to establish trusts which were unconstitutional. I believe there was a constitutional amendment including trust in the Forced Heirship Article. So, I urge you to please support Mr. O'Neill's amendment; just delete this section.

*1176 Questions
MR. NEWTON
Mr. Singletary, isn't it true that under the present Civil Code provisions that there is a disposal portion which is not part of legitime of the forced heirs?
MR. SINGLETARY
Yes, that's correct.
MR. NEWTON
... and, so the problem that you are addressing yourself to about these poor widows, with careful planning they can be taken care of through the forced portion so that they can't be run out of their homes; can't they?
MR. SINGLETARY
Well, Mr. Newton, unless you establish a trustand I'm not even sure you can do it under a trustif there is a forced portion, a forced heir is entitled to come in and demand his forced portion; isn't that right?
MR. NEWTON
That is correct. But, isn't it correct that there is a disposal portion and through careful management and planning, you can take care of these problems of having the widows thrown out of their homes?
MR. SINGLETARY
Not in every case because if a person has a home on a lot and he wants a will to protect his surviving spouse and he has forced heirs, you cannot put the forced portion.... you cannot subject it to a usufruct, if I read the code correctly. I don't believe that you can prevent a forced heir from coming in, at least in the situation if there is a forced heirship ascendant or a child of a previous marriage that can come in and force the surviving spouse to sell the property and distribute the proceeds. But, without getting into the merits or the problems of forced heirship, those situations can be corrected by the legislature. But, let's not go any further than we already have with regard to forced heirships. So, I urge you to vote for Mr. O'Neill's amendment and let's delete this section.
MR. DENNERY
Alvin, included in that section in addition to the provisions about forced heirship there is another sentence which permits the establishment of trusts in Louisiana; is that correct?
MR. SINGLETARY
Yes, that's correct.
MR. DENNERY
Now, under the present law if we had no such provision in the constitution, under the Civil Code Articles we could not establish trusts in Louisiana; could we?
MR. SINGLETARY
Under the present constitution?
MR. DENNERY
No, if except for the present constitution?
MR. SINGLETARY
No. Mr. Dennery, under this constitution that we are writing it would be my understanding that the legislature could amend the code.
MR. DENNERY
I understand that, sir. I'm asking, though, if it were not amended, we would not be permitted to have trusts in Louisiana; would we?
MR. SINGLETARY
I guess you're right, Mr. Dennery, but....
MR. DENNERY
What's worrying meand I'll put this in the form of a questiondo you agree that there is a problem in the event we do not put the authorization for trust in the constitution that the present trust conceivably could be all knocked out and no future trust could be established? Isn't it true that ...
MR. SINGLETARY
No. I don't agree with that, Mr. Dennery, because I believe that under the provisions that we have written so far, the legislature could amend the code.
MR. DENNERY
Well, then, wouldn't it have to be....
MR. SINGLETARY
... and, we had provided that the legislature can subject ownership to reasonable regulations which would mean that they could establish ... laws dealing with trust.

*1177 Further Discussion
MR. TOBIAS
Mr. Chairman, fellow delegates, I hesitate to rise on this amendment and oppose it. I am in favor of striking the first two sentences of this proposal. I think that abolishing forced heirship out of the constitution does not in and of itself abolish forced heirship; it's statutory. As I presently read Louisiana constitution and statutes, the legislature could very simply say that each child is a forced heir to the extent of one dollar. My main objection to this amendment is the striking of the lines 13 and 14 and these are the reasons why. Historically in this state, the Louisiana Supreme Court has been very, very restrictive on the use of trust; it has historically detested trust. Section 16 of Article IV of the 1921 Constitution has been amended ... was amended in 1944, amended in 1952, amended in 1958, amended again in 1962. Each time it was amended solely for the purpose of overruling decisions of the Louisiana Supreme Court, striking down the laws that were enacted by the legislature respecting trust; that was the reason. The Louisiana Supreme Court consistently struck down trust and by our deleting, by adopting the O'Neill amendment, by our deleting "of" of that sentence, I have the fear that we may be reinstating jurisprudence which the people of this stateand when I say jurisprudence, I mean, cases of the Louisiana Supreme Courtwe would be reinstating that jurisprudence which would have the effect of abolishing trust. I think it's very, very dangerous. I think it's unfortunate that our law has developed this way. But, I think by deleting that section, we are getting ourselves into a mess.
We passed upon this particular question of forced heirship very lightly in Section 4 of the Bill of Rights proposal and we deleted it on August 30, by a fifty-nine to fifty-five vote. I repeat, I'm in favor of deleting lines 10 through 12, but I just cannot support this because of that last of lines 13 and 14. I urge your rejection of the amendment.

Questions
MR. SINGLETARY
Max, could your suggestion be adopted, maybe, in some transitional measure?
MR. TOBIAS
I hate to take it out of the constitution, that provision on trust. I think it's a dangerous, dangerous thing we are doing. I think that nobody wants to take away the right of an individual to create a trust; it would force people to put their property in trust and just go to other states to do it.
MR. CHATELAIN
Max, I don't know this is the reason I'm trying to ask a question and trying to formulate thinking on this ... how I should vote on this. Right at the present time, I think, it's a legislative act that has to do with spendthrift trust. Would this do any violence to that or is this anyway connected in the present constitution?
MR. TOBIAS
In my opinion, if we delete lines 13 and 14, there is aand that's my legal opinion ... but just thinking about it very shortly, I've only thought about it for about the last ten or fifteen minutesbut I think we may have the effect of striking out our trust code in this state.
MR. CHATELAIN
Well, you know, many people in this state take advantage of this trust and it's being used more and more as time goes on; is that correct?
MR. TOBIAS
I realize that, yes, but I just....
MR. CASEY
You've exceeded your time, Mr. Tobias.

Further Discussion
MR. STINSON
Members of the convention, I would like to clarify several things. First, I would like to... some of those that might not know what the forced heirship is under the present law, of course, it is not in the constitution. Now, as to children, it's in the Civil Code, Article 1494. Now, if a person has one child, that child is forced to receive or they are forced to leave that child one-third of the property, two-thirds can be given to anyone, stranger, any charitable organization, any relative, or anyone. If there are two children, they have to be left half of the property. If there are *1178 three or more, the children have to be left two-thirds of the property. If there are no children, under the present lawnot in the constitution, but in the Civil Codeif their father and mother are living, they get two-thirds of the property. If there is one, either father or mother living, they get a one-third. There is some question in the jurisprudence during the Greenlaw Case as to whether it's one-fourth or one-third. Now, the reason is why should we have forced portions? I'm old-fashion enough to believe that children should still help in the family and they help while they are children in accumulating some of the property that their parents have. If you don't have forced heirship as in certain states you can leave them a dollar or five dollars and say, "That's all you're worth to me." The basis of our government and I believe all good government is our family group. I feel that a government, or a state, or a country is only as strong as the family ties. When don't have families as in Russia and other communist countries, we don't have the love; we don't have the feeling. I think that forced heirship is based on that and we should retain it in our constitution because if we don't we are going to find that a lot of us will reach an older age, we momentarily do not think as we ordinarily would. A father or mother might not be mentally insane enough to be interdicted or prohibited from making a will. But, in a moment when they are not right up to par they might will the property away to someone else and hurt the family tie, ruin the family connection. Now, someone said that if an older person marries a second wife and has children by the prior marriage that it would be to the injury of the second wife. Well, now, the husband ... there are a number of ways he can will that wife the disposal portion, in fact, if he has only one child he can will her two-thirds of his property; he can leave her an insurance policy; you can get government bonds made in her name; he can will other use of broad coverage. But, these changes are not in the constitution, they are in the legislature as they should be under this and under our past constitution. Now, as to the trust, if you don't have forced heirship, you wouldn't have a trust anyway, you're going to give them to someone else and usually the trust is to guard the property for some child that might not be exactly financially responsible and the parent is concerned about his future security. That's the concern of the parent, he should be the one to say what he wants to do with it; by putting it in you don't say he has to have a trust; it's if he wants to. After all, you argued one time was his property should be given away and another says, "Well, it's his property, but he shouldn't say how his child is going to have it; that's contradictory. But, under this it simplified leaving it to the legislature subject to change as times change. I would like to ask you to please let's reject this amendment and leave it like it is and leave it up primarily to the legislature as to who the forced heirs are, what the percentages are, and things of that type. So, I would like to urge you, please, let's vote this amendment down.

Questions
MR. BURNS
Ford, in line with what you just said. Do you not agree that if we do away with forced heirship that it's equivalent of authorizing disinheritance of children?
MR. STINSON
Yes, sir, I certainly do. Mr. Burns, what I'm fearful of is when a person gets up much older than we are, you know they pick up little things and they hold against a child because maybe the child doesn't come to visit them every day, so he doesn't love me any more, I'm going to cut him out and you have subject to that, it's not sound basically that we should disown a child. Why should you be adopted as some stranger to someone when the child is yours, it's your life and blood, he helped you accumulate it?
MR. BURNS
That's one of the greatest dangers I see of doing away with it, it would permit that to.... enable it to be possible.
MR. STINSON
Yes, sir, I certainly agree. I still say, Mr. Burns, that usually those children help them accumulate it, of course, some of them......

*1179 Further Discussion
MR. SMITH
Mr. Chairman, fellow delegates, I rise opposed to this bad amendment. I think it's very ill-advised. I'm not saying anything about my good friend, Gary O'Neill, but if you noticed, no lawyer introduced it. I think very few of them are going to support it. I've been a practicing attorney for over forty-four years; I've done a lot of succession practice, practically more of that than anything else. I've written quite a few wills. But, I think I'm more adverse in heirship and succession proceedings. I think our forced heirship is good; it's fair, it's equitable. Mr. Stinson said it might in some casesdone some wrong and some others that have happened. But, I think all together like he said when a person leaves one child he can give away two-thirds, that's the disposal portion, two children, a half, three or more, a third, his wife is taken care of, too. When you have community property, the wife gets a half of the property anyway. If there are children of the marriage, she gets the use of the other half. So, I think everyone is well taken care of. If they have no children, then, the parents come in for a fourth or maybe a third, it's kind of confused right there. So, I think we have a very good law on forced heirship and its' been in our law from time immemorial. As a lawyer of many years and has done a lot of practice in the successions, I think we should go ahead and reject this amendment without any question. I, now, I don't think it's entitled to any more debate. I now move the previous question.
[Motion for the Previous Question rejected: 24-65.]

Further Discussion
MR. BURSON
Mr. Chairman, fellow delegates, not having had the many years of experience in the practice of law that Mr. Smith has had, I've nonetheless had enough experience to view any abolition of the guarantee of the right to forced heirship as a serious mistake. I oppose the amendment for that reason. It seems to me that in our civil law system in Louisiana that we can be proudest of our laws on property and on succession and inheritance. The stability of our society, in my view, depends to a great extent on maintaining forced heirships. My reasons are thus: if you do not have forced heirship, you leave always open the possibility for squabbles among children, for instance, as to who is to obtain the favored position. You even leave it possible for some children to be shutout altogether from their inheritance. I think you put temptations in the way, of human nature being what it is, where you will have situations where people will be completely disinherited and alienated thereby from their family and in all probability for the remainder of their lives. You also have other motives of the stability of society involved here; the motivation of support for the children that one leaves behind; the motivation for the support of aged parents who are also forced heirs under this system because if the individual responsible does not support them, then assuredly society itself must do so. I feel that you increase very greatly the danger of imposing upon people who because of advancing years no longer possess perhaps the mental capacity to deal with wily schemes to induce them to leave their property to one individual or another and completely eliminate the inheritance of their other children or perhaps of their needy parents. So, for all of these reasons, I urge you to reject the amendment and to maintain the essence of the committee proposal which, I think, maintains the essence of our present law which is contained in Article IV, Section 16 of the present constitution and says succinctly that no law shall be passed abolishing forced heirship; let's retain that.

Question
MR. BURNS
Mr. Burson, in your practice of law, have you not had on many occasions a couple come to your office for the purpose of having you draw a will and when you explain to them the Louisiana law, they say, "Well, we don't need a will, that's the way we want it"?
MR. BURSON
Very many times, and I've also had the experience of people coming to the office to *1180 draw up a will, unfortunately, to find out whether or not they could disinherit two or three children and that situation, I'm afraid, would happen all too often.

Further Discussion
MR. RIECKE
Mr. Vice-Chairman and ladies and gentlemen, I have a particular interest in this amendment because you see I happen to be personally going through the process now of making a will and settling a succession. Under the present Louisiana law, two-thirds of my estate goes to my children who helped me to build up my business, and I think they are entitled to that. But, what I particularly object to in this amendment is the elimination of the establishment of the trust because you see when I remarried I lost the use of the property which my first wife and I possessed. Therefore, in an effort to try to take care of my new wife, whom you all know, who is only entitled to one-sixth of my estate, my lawyer is drawing up a trust so that upon my death she will be taken care of for the rest of her life only by one-third of what I own. If we would eliminate in this constitution the establishment of a trust, I don't know what my lady would do to support herself after I pass away. As you know I'm kind of an old man and she is a young woman, and I want to see that she is taken care of after I pass away. So, please, vote against this amendment which was submitted by a very young man who hasn't had the experience that I'm going through now. I know he will change his mind when he gets to be seventy, as I am. So, please, vote against this amendment. Thank you.

Further Discussion
MR. DENNERY
Mr. Riecke makes a hard act to follow, but I would point out to the convention the basis for forced heirship in Louisiana. It really goes back almost before the Populist Movement. If you all will take a minute and listen to me, as Mr. Jack would say, I will tell you some very interesting historical facts.
Under the English law, it is customary to leave all of one's estate to one's eldest child. This is known as the law of primogeniture the eldest son, excuse meand the French people, way back around the time of Napoleon, felt this was unfair because it was a method of building up large estates. The French people in our state also agreed that it was not a good idea to keep building up estates, generation after generation, because you would accumulate all the wealth in a very small group. That is the purpose, basically, of the laws of forced heirship. You can still disinherit an ungrateful child under certain specific basesI think there are tenof which I think only one has ever been upheld. The other nine are rather out-of-date now such as refusal to bail somebody out if he's held by pirates for ransombut the law of forced heirship is a basic law in this state. I don't believe it should be completely abolished. I do agree that there are some situations, under the present laws of forced heirship, which are unfair. I believe that the legislature can correct these, but I do not believe that the legislature should abolish the laws of forced heirship. The third sentence in this section is possibly more important. This is the one which authorizes the legislature to permit trusts to exist in Louisiana and to place the forced portion of a child, or an ascendant, subject to that trust. This is a method of protecting other heirs and, at the same time, permitting income to go to a widow or a widower, or a mother or a father, or a child who is an incompetent. It seems to me that it is essential for us to have something in the constitution which specifically permits trusts because trusts, like the law of primogeniture, are frowned on in the French law. Under our present-day tax setup in this country, however, trusts prove to be a very useful tool to lawyers, to accountants, and to anybody who's interested in protecting an estate from estate taxes. For this reason, I strongly urge you to defeat this amendment. The section is very simple; there is very little in it; it is not in great detail. It leaves a lot of leeway to the legislature; and, yet, it freezes into the lawand, I believe, quite properlysome of the basic concepts of our Louisiana law.

*1181 Questions
MR. J. JACKSON
Mr. Dennery, on the forced heirship, there's been some question, now, and tremendous debate about legitimacy and illegitimacy. There still would be a portionif some suit is filed regarding the legitimacy or illegitimacy of a childthere still would be a portion under forced heirship wherebylet's say it resolvedwhereby a person could very well, of the disposable portion, determine where that would go. Right?
MR. DENNERY
Yes. It depends upon the type of illegitimacy under the present code, but the code could be amended to protect that situation, Mr. Jackson.
MR. J. JACKSON
If the code is amendedlet's say the code is amendedwould this constitutional provision about forced heirship prevent or negate any changing of the code?
MR. DENNERY
I don't believe so. As a matter of fact, I think the code could probably provide that illegitimate children have as many rights as legitimate children.
MR. RIECKE
Yes. Mr. Dennery, I have a great deal of respect for your judgment, but you didn't sayin order to make it perfectly clearyou didn't say whether you were for or against the amendment.
MR. DENNERY
I said I was against the amendment. I urged everyone to vote against it.
MR. RIECKE
O.K. Fine. I just want that made clear.

Further Discussion
MR. JENKINS
Mr. Chairman, I rise in support of this amendment. Mr. Dennery very accurately discussed the historical background of forced heirship: the fact that primogeniture was the rule in England, requiring that sums be left to the oldest son; and how the French people in Louisiana chose to go with another system as an alternative to thatthe idea of forced heirshipthat children and other relations should receive a portion of an estate, to the exclusion of all others and possibly against the will of the deceased. The difficulty is that, in relation to primogeniture, forced heirship is a good concept, but there is another alternative. Both of those concepts are contrary to the idea of freedom of disposition. Both primogeniture and forced heirship say that a person's property is not truly his own, in regards to disposal. The state will determine, to some extent, how that property will be disposed of. I suggest the proper concept in a free society is that a person's property is his own and, when it comes time to dispose of it, he has the right to dispose of it as he sees fitwhether it be to his children or other people. The history of forced heirship was that we needed to break up vast estates. Landa constant redivision. That is no longer socially desirable. Just the contrary is true. Tracts of land, in particular, are increasingly needed to be consolidated, not broken up. That is out-of-date. One of the bad things about forced heirship is that it gives children a financial interest in the death of their parents. At present, it is all but impossible to disinherit a child. Now, here's what a child can do to a parent: He can testify against him in court, falsely; he can have him committed to an institution, falsely; he could fail to support his parent when in distress. But, for none of those reasons, could a parent disinherit his children. That parent would be required, on death, to have certain of his assets and possessions go to that child who had wronged him in the past. There's no justice in that. Now, it's been said that this provision protects the idea of trusts. The best way to protect the concept of trusts and to promote their use is to delete this section so that the legislature can adequately deal with the question of trusts and not have constitutional limitations with regard to forced heirship. In any case, the present provision in the constitution says that forced heirship shall not be abolished. This says it shall not be abolished, but the heirs and their amounts can be determined by law. That means that the legislature could establish a system whereby one dollar would have to be given to each heir, and that would satisfy the forced portion; so it's not an effective prohibition. The only thing it can do is to muddle the law *1182 with regard to trusts and muddle the law with regard to the freedom of disposition. The social policy, if you're interested in social policies that ought to be pursued, is against forced heirship because children should be encouraged to take care of their parents. If you have a system of forced heirship, there's no financial incentive for children to take care of their parents because, whether they take care of them or not, they're going to get the forced portion. Virtually nothing the child does, except attempt the life of the parent, can change that. If children in this state knew that they could be disinherited for reasonable grounds, they would have more incentive to care for their elderly parentsto keep them out of rest homes, to keep them out of institutions, to give them the proper attention that they deserve. Forced heirship is contrary to that doctrine. By deleting this section, we will not abolish forced heirship, however; we would leave it to the legislature. That's where I think it ought to be left. The legislature can deal with this and, if in the future the legislature desires to change the laws of forced heirship, or abolish forced heirship, in its wisdom, it could do so. But, we don't need what is basically a Civil Code provision placed in the constitution. This belongs in the Civil Code, not here in the constitution. So, I urge you to adopt this amendment, delete this provision, leave it to the legislature; and, possibly, someday in the future we might have a system that would encourage children to take care of their parents, rather than giving children a vested interest, automatically, in the death of their parents. So, I urge the adoption of the amendment.
[Previous Question ordered. Record vote ordered. Amendment rejected: 11-93. Motion to reconsider tabled.]

Amendments
MR. POYNTER
Next group of amendments sent up by Delegates Dennery and Alphonse Jackson.
Amendment No. 1. On page 2, line 10, after the word "abolish" and before the word "forced" insert the word "descending".
Amendment No. 2. On page 2, line 11, after the word and punctuation "heirs," delete the word "an" and insert in lieu thereof "the".
Amendment No. 3. On page 2, line 12, after the word "for" delete the word "disinheritance" and insert in lieu thereof "disinherison". (How do you say that? Has that got it, Mr. Dennery?)
Amendment No. 4. On page 2, line 13, after the word "law" delete the words "for any purpose".
Amendment No. 5. On page 2, line 13, after the word "a" delete the portion of the word "legitime", and the remainder of the word at the beginning of line 14, and insert in lieu thereof "forced portion".
The gentleman does not wish to offer the first amendment. He does not want to offer the first amendment, so Amendment No. 2 will become Amendment No. 1; Amendment No. 3 will become Amendment No. 2, etc.

Explanation
MR. DENNERY
I would like to explain that I deleted my first amendment because there was some question about whether we should limit forced heirship to descending heirs only, or should it remain, as it is now, in the ascending line? Now, it is true that under Social Security and pensions, etc., there is not as great a need for the forced heirship in the ascending line; and the legislature, therefore, within the framework of this section giving the determination of forced heirs and the amount of the forced portion, can take care of that situation if it is desirable to do. The purpose of the other amendments, really, are more or less technical. The insertion of the word "the", rather than "an", is purely technical, in the second line. "Disinherison" is the word that is used in the Civil Code, and I thought it better to use the same language which the Code has, instead of "disinheritance." The fourth amendmentI deleted the words "for any purpose" because there was some question as to whether that did not limit the legislature, rather than make it more flexible; and, therefore, I have removed trusts so that trusts may be authorized by law. Instead of using the word *1183 "legitime," I have gone back to the words "forced portion," which were used previously. These two words are interchangeable but, since we used "forced portion" on line 11, I thought it more desirable to use "forced portion" on lines 13 and 14. I would ask the adoption of the Amendments Nos. 2, 3, 4, and 5. I'm advised that the Committee on Bill of Rights and Elections has no objection to these.

Question
MR. AVANT
Mr. Dennery, this is just one of those questions for the record. If your amendment is adopted, then, under this section as amended, the legislature would have the right by statute to change the classification of persons who are forced heirs, change the amount of the forced portion, or do virtually anything that, in their wisdom, they thought was correct with the systeminsofar as correcting what they may feel to be inequities but they could not abolish the system. There would be a system of forced heirship, but what it consisted of, and all of the refinements thereof, would be up to the legislature?
MR. DENNERY
Yes, sir. That's the whole purpose of this section, and I believe, Mr. Avant, that that's basically the law as it presently stands.
[Previous Question ordered. Amendment adopted: 101-3. Motion to reconsider tabled. Previous Question ordered on the Section. Section passed: 102-6. Motion to reconsider tabled.]
MARCUS, Justice (dissenting).
Article IV, § 16 of the 1921 Constitution provided that: "No law shall be passed abolishing forced heirship...." Article XII, § 5 of the 1974 Constitution provides that "[n]o law shall abolish forced heirship. The determination of forced heirship, the amount of the forced portion, and the grounds for disinherison shall be provided by law...."
The majority concludes that art. XII, § 5 of the 1974 Constitution and art. IV, § 16 of the 1921 Constitution are similar. I disagree. Clearly, there was a change in the law. I believe that the second sentence was intended to empower the legislature to define forced heirship with the prohibition against its abolishment. In my view, the amended art. 1493 of the Civil Code does not abolish forced heirship but rather makes a determination of forced heirs in accordance with the second sentence of art. XII, § 5 of the 1974 Constitution.
Accordingly, I respectfully dissent.
HALL, Justice, dissenting.
I respectfully dissent for the reasons expressed by Justice Kimball, and add these additional reasons.
Article XII, § 5 of the 1974 Louisiana Constitution provides, in pertinent part, that
No law shall abolish forced heirship. The determination of forced heirs, the amount of the forced portion, and the grounds for disinherison shall be provided by law.
The second sentence of the section should be applied as written. It is a clear and positive empowerment of the legislature to regulate the concept or institution of forced heirship.
As the second sentence clearly states, the legislature is given the express authority to determine who shall be forced heirs. I agree that this authority is subject to the command in the first sentence that no law shall abolish forced heirship, that is, do away with it altogether or reduce it to some insignificant quality, but the provision before us falls far short of abolishing forced heirship.
Since adoption of the 1974 Constitution, the legislature has seen fit to restrict the definition of "forced heir" in several ways. The first restriction came about in 1981 with the repeal of LSA-C.C. art. 1494's provision for ascendant forced heirship. The 1981 Act also amended LSA-C.C. art. 1493 to reduce the forced portion of descendants.
The legislature again restricted the definition of "forced heir" by Act 788 of 1989 and Act 147 of 1990. These two Acts served to restrict the definition of "forced heir" to descendants who are either under the age of twenty-three years or to descendants of any age who are, due to mental capacity or physical infirmity, incapable of taking care of their persons or administering their estates. Despite *1184 these restrictions, forced heirship remains a significant part of Louisiana law with a broad and substantial scope. It is applicable to the full extent of all of the core purposes of forced heirship as described in the majority opinion to each and every Louisiana family, parents and children, for at least twenty-two years from the beginning of the family's existence. I must disagree with the majority's conclusion that the acts of the legislature effectively "abolish" forced heirship in contravention of the state Constitution.
In determining the constitutionality of the present law, it is not necessary to define the limits of the legislature's authority to restrict (or enlarge) the category of forced heirs or otherwise modify the forced heirship scheme. It suffices to say that if the legislature does not have the authority to adopt the modifications that are before us as LSA-C.C. art. 1493, the second sentence of Article XII, § 5 is rendered meaningless.
The majority opinion cites leading commentators as observing that
the constitutional provision allowing the Legislature to determine forced heirs, the amount of the forced portion, and the grounds of disinheritance is not an invitation to destroy the concept, but a grant of flexibility within the confines of the institution of forced heirship.
(Emphasis added.) Spaht, Lorio, Picou, Samuel, and Swaim, 50 La.L.Rev. at 414. The majority opinion then seeks to negate any "flexibility" that the legislature has by determining that virtually any law but one which continues the law that was in effect in 1921 threatens the "institution" of forced heirship. Webster's New Collegiate Dictionary, 1980 ed., defines "institution" as "a significant practice, relationship, or organization in a society or culture." The modifications before us today preserve the "significant practice" of limiting disposition of a portion of a parent's estate in favor of the inheritance rights of the parent's children under certain circumstances. The "institution" continues, albeit in an altered form.
The majority opinion desperately clings to an ancient tradition that had its roots in entirely different times and circumstances. The people of this state in a new Constitution adopted in 1974 empowered the legislature to modify the traditional rules of forced heirship. In 1989 and in 1990, the people of this state, through their elected representatives in the legislature, adopted the modifications that are before us today. The institution of forced heirship survives, but as modified through the constitutional and legislative process to reflect the modern-day will of the people, responding to modern-day circumstances.
The majority opinion cites Chief Justice Marshall on the federal constitution as saying that "(t)he people made the Constitution and the people can unmake it. It is a creature of their own will, and lives only by their will." Cohens v. Virginia, 6 Wheaton (19 U.S.) 264, 389 (1821). It would seem that the majority opinion ignores these very words that it brings to our attention, as the people of Louisiana have spoken on at least three occasions throughout the political process to say that they want the modifications that are before us today. By striking down these modifications, the majority has substituted its will for the will of the people.
KIMBALL, Justice (Dissenting).
La. Const. Art. XII, Sec. 5 provides:
No law shall abolish forced heirship. The determination of forced heirs, the amount of the forced portion, and the grounds for disinherison shall be provided by law. Trusts may be authorized by law, and a forced portion may be placed in trust.
The majority holds the constitutional "enshrinement" of the institution of "forced heirship," precludes the legislature's exercise of its constitutionally granted power to "determine forced heirs" to the extent such exercise might exclude certain descendants from the class of forced heirs.[1] Because I disagree *1185 with the majority's conclusion and with the analytical machinations engaged in to reach that conclusion, I respectfully dissent.
As this is such an immensely important topic affecting every person in this state, a complete overview of the origins of forced heirship as well as its development in Louisiana is warranted. Following an analysis of this historical development, I will: (1) address this historical development's impact on forced heirship as protected under Article XII, Sect. 5; (2) explain how the majority errs by rendering one clause of the constitution meaningless under the pretense of giving effect to another clause; and (3) provide an alternative interpretation of the subject provision which gives equal dignity to both clauses and which accurately comports with the prior jurisprudence of this court as well as with contemporary notions of forced heirship.

Early History of the Institution of Forced Heirship
Because Louisiana's institution of forced heirship is an amalgamation of several bodies of law, I believe a reference to the history of those bodies is necessary to determine what the protected institution is in Louisiana.
Louisiana was originally colonized by French settlers in the early 1700s. These settlers brought with them the laws of France, particularly the Custom of Paris. These laws are believed to have been the origin of the institution of forced heirship in Louisiana.[2] In the mid-1700s, France ceded Louisiana to Spain. Spanish law, which had its own concept of forced heirship, reigned over the Territory for nearly forty years thereafter. Then, in the early 1800s Spain agreed to return the Territory to France. Before this transfer from Spain to France took place, however, France sold the Territory to the United States.
Thus, Louisiana's concept of forced heirship is a result of the French and Spanish rule over the Territory. Because Roman Law is the earliest source of the institution of forced heirship and the framework from which all other legal systems' versions of the doctrine evolved,[3] including the French and the Spanish, this analysis necessarily begins with consideration of that system.

Roman Law
The Roman institution of forced heirship traces its roots to two very important concepts in early Roman society: the familia and the sacra. The familia, the Roman concept of family, consisted of the paterfamilias (head of family) and those who, by male relationship, were under his power. The familia was the basic unit of society, and its preservation was considered essential to maintaining societal order.[4] To foster the maintenance of this unit, the pater was granted very extensive powers over the familia, including the vesting of all rights and property acquired by any member of the family. Clothed with such extensive powers, there was no room for restrictions on the paterfamilias' absolute power of disposition over familia property; thus, the pater had unrestricted freedom to distribute his estate in legacies to anyone.[5] If the pater died intestate, however, his children were first in line to inherit.
Of equal importance to the familia in early Roman society was the sacra, the family cult *1186 to the individual household gods. The Romans deemed the continuance of this cult by successive heirs from one generation to the next essential to their society.[6] The continuance of the familia sacra was so important to this society that other areas of the law were tailored with a view to insuring its continuance. Thus, for example, if a man had no child, he was permitted to adopt one so that the sacra could be continued.
In furtherance of these two very important customs, the first Roman wills had for their purpose not the disposition of property but rather the institution of an heir to continue the familia and the sacra.[7] Indeed, any will which failed to institute an heir was held invalid.[8] Moreover, as a protection against the possibility that the instituted heir might not enter the succession, the testator was permitted to name one or more substitute heirs (substitutio vulgaris) who could enter in the event the instituted heir refused to do so.
Despite these efforts to protect and preserve the familia and the sacra, the testator's absolute freedom of disposition by legacy soon became a threat to the vitality of these institutions. That is, because the testator frequently disposed of most or all of his assets by legacies, the instituted heir often refused to enter the succession as all he was left with was the undesirable burden of paying the testator's debts and carrying out any testamentary instructions. As a result, the testator's estate would devolve intestate and there would be no heir to carry on the familia and the sacra.
Seeking to remedy the foregoing problem, there developed in Roman Law certain restrictions on the paterfamilias' absolute power of disposition. One of the most famous of such limitations was the lex Falcidia, which reserved a minimum one-fourth of the testator's estate[9] for the instituted heir (the falcidian portion). Excessive legacies which impinged the falcidian portion were subject to proportionate reduction. Notably, however, this restriction on a testator's absolute freedom of testation was designed solely to protect the institutions of the familia and the sacrait was not necessary that the instituted heir be a relation of the testator, only that the instituted heir be a person capable of inheriting.[10]
Although the foregoing limitation on a testator's freedom of disposition was not developed out of a concern for the testator's heirs,[11] there existed at the same time two other restrictions on the paterfamilias' absolute freedom of testation which did have protection of the testator's heirs, including his children, as their purposes. The first such limitation was found in the rules of exheredatio. This limitation reflected the Romans' general disapproval of disinherison by subjecting it to extremely strict formalities. Failure to comply with these formalities would result in the nullity of the will. Importantly, however, this limitation was strictly a matter of form and did not interfere with the testator's power to dispose of familia property as he saw fit. More importantly, it provided no direct assurance that children of the testator would be provided for in the will.
The second limitation on the testator's freedom of disposition was in the querela inofficiosi testament.[12] The querela was based on the principle that a man owed a moral duty toward certain close relatives, and disinherison of these relatives without just cause violated this duty.[13] The relatives protected by the querela were ascendants and descendants of the decedent, whenever they had been unjustly disinherited, and cousins, brothers and sisters of the decedent, when the decedent had preferred others of *1187 questionable character or morals.[14]
Initially, if one of these heirs established the requisite conditions, the will would be declared void and the heir would receive his intestate portion. This sanction was subsequently changed such that the complainant would receive a reasonable share of the estate, but the entire will was not disturbed. Later the complainant's portion under the querela was changed again, this time to fix it at one-quarter of an intestate share, and the complainant could pursue this amount if he received less in the will. Finally this portion was changed one last time by Justinian, who increased the portion to one-third of the estate if there were four or fewer children and one-half of the estate if there were five or more. These latter portions came to be known as pars legitima or the légitime.[15]

Customary Law
In contrast to Rome, the regions governed by the customary law, such as France, operated under a doctrine known as the réserve. Although the origin of the réserve is not well known, the doctrine is generally viewed as arising from a concept of family co-ownership of estates and a political notion of preserving this co-ownership.[16] This stands in stark contrast to the Roman institution of légitime, which was based on a perceived moral duty which the testator owed to his close relatives.
Because the basis for the réserve was different from that of the légitime, its application as a limitation on a decedent's freedom of testation was likewise dissimilar. Whereas the légitime was levied against all of a decedent's property, the réserve operated only on propres (immovables acquired by inheritance)acquets, community immovables, and all movables were freely disposable. Furthermore, while the Roman légitime preserved a maximum of one-half of the decedent's estate (if he left five or more heirs), the réserve operated on a much greater portion of the decedent's propres, four-fifths of the decedent's propres regardless of how many heirs the decedent left.[17] Finally, the réserve was only a limitation on a decedent's testamentary dispositions; the testator could still deprive the heirs of the réserve by inter vivos donations. Similar to the Roman légitime, however, the réserve was available to collaterals of the testator as well as the testator's ascendants and descendants.[18]
With the passage of time, influenced by Roman law, the customary law began to recognize a paternal duty to provide for the maintenance of one's children and other descendants. This recognition culminated in the customary law's adoption of a form of légitime. The légitime adopted in these regions was available only to descendants of the decedent and only when the réserve was insufficient to adequately insure the descendant's welfare.[19] In its earliest stages, the adequacy of the réserve was determined on a case-by-case basis and when it was found inadequate, the légitime was set at an amount designed to allow the heir to live reasonably. As it developed, the customary law's légitime became fixed at one-half of an intestate portion and the determination of adequacy consisted of a comparison of the réserve to the légitime. If the latter was greater than the former, then the légitime was available. Like the Roman légitime, the customary law's légitime protected the heirs against inter vivos dispositions and was imposed without distinction between the various types of property.[20]
Later, during the French revolution, the desire in France was to break up the large estates and prevent their reconstitution. The Law of 17 nivôse an II (January 6, 1794) was passed as a social tool to accomplish this end by drastically limiting the disposable portion (to one-tenth if there were linear heirs; one-sixth if only collaterals). This law *1188 forced the partition of the testator's estate into at least as many separate tracts as there were children in the family, thereby breaking up the estate and preventing its reconstruction.[21] Moreover, even the small disposable portion which remained could not be left to a single heir. This law had severe, adverse consequences and was soon liberalized, restoring to the testator a greater freedom of testation.[22]

Spanish Law
The final source of forced heirship doctrine for consideration is the Spanish law. The Spanish laws of forced heirship were of more or less direct Roman origin. Although the evolution of forced heirship under Spanish law is long and involved, a review of this history reveals three basic points of interest about the Spanish law of forced heirship at the time the Territory of Louisiana was under Spanish rule. First, the only persons entitled to the légitime under Spanish law were ascendants and descendants; similar to French law, collaterals were excluded but, unlike French law, ascendants were included. Second, the children's légitime was four-fifths of the parent's estate, although this amount could be decreased to one-third when this one-third was donated for the betterment of the children of the testator. The ascendant-parent's légitime under Spanish law was two-thirds of the child's estate.[23] Finally, the Spanish law recognized the doctrine of mejora, by which the testator could give one child one-half of the forced portion, splitting the remainder among the other children.[24] The Spanish recognition of mejora is interesting because it is completely contrary to the French notion requiring equality of treatment of all children.

Analysis of Early History
Although the history of forced heirship in Roman, French and Spanish law is somewhat obscure, there are several general observations to be discerned from it. First, although restrictions on the testator's freedom of disposition were recognized in early Roman, French and Spanish laws, there was never an agreement among the various bodies of law regarding who the beneficiaries of these restrictions were.[25] This disagreement is, at least in part, a consequence of the varying purposes which these restrictive laws sought to achieve. In particular, in Rome, the falcidian portion was used to insure the instituted heir would enter the succession and continue the familia and the sacra, while the Roman légitime was used to compel a decedent to provide for certain close relations to whom the decedent was perceived as owing a moral duty. By contrast, the French légitime had the dual purposes of enforcing a perceived moral duty owed by the testator to certain close relations, as well as compelling the testator to provide for the maintenance and support of his descendants.[26] Finally, the purpose behind the French réserve differed wholly from the légitime under either Roman *1189 or French law, the réserve having for its object the continuation of family estates (although this purpose varied briefly when the réserve was used to break up large family estates).
In addition to variations in the beneficiaries under each of these systems (which were based on the correlative variations in the purposes behind the limitations), the amount of the reserved portion has also varied. Moreover, the variations in the amount of the reserved portion are found not only between each of these societies but also within each of these societies. Importantly, this observation regarding the forced portion holds true not only for the early legal systems from which we derived our institution but also for Louisiana's system of forced heirship as well.[27]
The laws regarding limitations on freedom of disposition have never been static. Rather, these laws have varied among as well as within each society based on the different mores of that society and the changes which it has undergone. Thus, it is easy for me to see that the people may have intended a change in our forced heirship system in 1974.

Forced Heirship as it Developed in Louisiana

Early Law
As a possession of the United States, the vast Territory of Louisiana was broken into smaller territories with approximately what came to be the State of Louisiana being declared the Territory of Orleans. The first legislature of the Territory of Orleans was appointed by Congress and, in turn, this legislature appointed commissioners to codify the existing laws then in force in the Territory. The commissioners' completed compilation, "A Digest of the Civil Laws now in Force in the Territory of Orleans with Alterations and Amendments Adapted to its Present Form of Government," was adopted by the legislature in 1808. This original version of the Civil Code largely reflected the French laws on forced heirship with the notable exception that the Spanish laws on quantum of the légitime were codified. Specifically, La.Civ.Code art. 22 (1808) provided that a parent's donations could not exceed one-fifth of his property to the prejudice of his children and those of a child could not exceed one-third to the prejudice of the parents. The Civil Code of 1808 also adopted the Spanish rules regarding disinherison, but omitted any reference to the Spanish concept of mejora.
This original version of the Louisiana Civil Code was revised in 1825. The 1825 revisions increased the disposable portion and, now tracking the French Civil Code, graduated this portion based on the decedent's number of children. With respect to the increased disposable portion, the reasons for the amendment state: "D'après le voeu généralement manifesté de laisser aux pères plus de liberté dans la disposition de leurs biens, nous avons augmenté considérablement la portion disponible,"[28] or "We have increased considerably the disposable portion in consequence of the general wish in favor of parents having more liberty in the disposition of their property."[29] Thus, as was the case with each of the legal systems from which Louisiana drew its forced heirship laws, this state demonstrated early on that the institution of forced heirship was not a static concept, but rather was subject to revision to foster varying social desires or concerns.
Following these changes in the disposable portion, the laws relating to forced heirship generally remained unchanged until the Civil Code was again revised in 1870. With the 1870 revision, La.Civ.Code art. 916 (1870) was enacted, introducing the surviving spouse usufruct into Louisiana law. While Article 916 did not further enlarge the disposable portion, it did diminish the descendant-forced *1190 heir's legitime by allowing part of it to be encumbered with a usufruct, thereby depriving the forced heir of his right of immediate possession of the légitime.
After the turn of the century, in another change to Louisiana's doctrine of forced heirship, the Louisiana legislature essentially reduced the forced portion by enacting 1914 La.Acts No. 189. Therein, the legislature exempted the "proceeds and avails" of life insurance policies from claims of heirs of the insured when the policy was made payable to a designated beneficiary. Under this provision, a testator could name a non-forced heir as the beneficiary of a life insurance policy and the testator's forced heirs would not be able to seek reduction of the life insurance proceeds. See, e.g., Succession of Dumestre, 174 La. 482, 141 So. 35 (1932).
Six years later, the Louisiana Legislature allowed, as with the surviving spouse usufruct, for further deprivation of immediate possession of the legitime with 1920 La.Acts No. 107. In this Act, the Louisiana Legislature introduced a limited form of trust into Louisiana law. The trusts authorized by Act 107 allowed a testator to have a third party administer the legitime for the benefit of the forced heir with the forced heir only entitled to receive the income from the trust annually. Moreover, Section 8 of Act 107 expressly repealed any laws regarding the legitime insofar as those laws conflicted with the purpose of the Act.
The legislature's approval of trusts in 1920 was regarded by many as an infiltration of common law doctrines into Louisiana to the detriment of civil law principles prohibiting substitutions and fidei commissa.[30] So strong were these sentiments for one Louisiana legislator that one year after the passage of Act 107, he proposed a constitutional amendment limiting the legislature's authority to approve of trusts in Louisiana.[31]As somewhat of an incidental matter, the proposed amendment also provided constitutional protection for the institution of forced heirship.[32] Although that portion of the proposal addressing trusts was substantively amended before passage, the prohibition of the abolition of forced heirship was included in the 1921 Constitution with only minor editorial changes.[33] Thus, forced heirship became a constitutionally protected institution under La. Const. Art. IV, Sec. 16 (1921).
After the adoption of the 1921 Constitution, this court in Succession of Earhart, 57 So.2d 695 (La.1952), was called upon to interpret the meaning to be given to the first clause of Article IV, Section 16"No law shall be passed abolishing forced heirship" in light of that Section's latter grant of authority"the legislature may authorize the creation of trust estates." Indeed, Earhart was the only case prior to the adoption of the 1974 Constitution which pointedly addressed how to resolve the conflict between the abolition clause and its adjoining constitutional grant of authority to the legislature to authorize trusts. In Earhart the plaintiff-forced *1191 heir complained of a provision in his decedent-father's will which placed the legitime in trust. The plaintiff argued the legislature's enactment of statutes which allowed for trusts and which could be used to deprive the forced heir of immediate possession of his legitime violated the constitutional prohibition against abolition of forced heirship. Relying on the 1921 Constitution's grant of authority to the legislature to create certain limited-term trust estates, this court concluded the Framers of that constitution regarded the creation of such trusts as not being an abolition of forced heirship. Accordingly, the forced heir's claim was rejected.
Following our decision in Earhart, Article IV, Section 16 of the 1921 Constitution was amended several times, generally granting the legislature greater freedom in the creation of trusts.[34] Despite these amendments, the language of the prohibiting clause was never strengthened. More importantly, despite the Earhart court's recognition that forced heirship is not abolished when the legislature exercises the constitutional authority given to it under the same provision, the Constitution of 1974 further expanded the legislature's authority under that provision.[35]

Developments under the 1974 Constitution
Although the 1974 Constitution retained the 1921 Constitution's language prohibiting the abolition of forced heirship ("abolition" or "prohibiting" clause), the new constitution contained an additional clause declaring that "the determination of forced heirs" shall be decided by the legislature ("empowering" clause). This change was viewed by some delegates to the constitutional convention as merely making explicit what had been implicit under the 1921 Constitution, particularly in light of Earhart;[36] that is, that the legislature had broad powers to vary the laws regarding forced heirship provided they did not "abolish" that institution.[37] This is especially so where the legislature does not have to rely on the definition of "abolish" in order to find room to exercise its power but is instead able to find its authority to act in a specific grant under the same constitutional provision.
At this point, I note my disagreement with the majority's conclusion that Article XII, Sect. 5 is clear and unambiguous, and, therefore, resort to the Constitutional Convention Transcripts is not appropriate. The majority makes three errors regarding the transcripts by finding: (1) that resort to transcripts is only proper when a provision is unclear; (2) that Article XII, Sect. 5 is clear; (3) that transcripts have little value; and (4) that the transcripts herein bear out the majority's interpretation.
First, this court has previously held that even in the face of clear and unambiguous *1192 constitutional provisions, the transcripts are "valuable aids" which "should be given some weight in determining the purpose, intent, and consequent meaning of provisions for those who find them doubtful." New Orleans, Etc. v. Civ. Service, Etc., 422 So.2d 402, 407 (La.1982).
Secondly, even assuming the transcripts are to be used as an interpretive source only when the provisions are unclear, I believe the section in question herein is definitely ambiguous and not at all clear. Although each sentence, when read separately, is clear, when the two sentences of this constitutional provision are read together, as they must be, the inherent tension between the two becomes apparent. "If the words of a constitution are indeed ambiguous, a court may resort to the transcripts of the constitutional convention proceedings as an aid to find the purpose, intent, and meaning of those words." Cajun Elec. Power v. Public Serv. Com'n, 544 So.2d 362 (La.1989).
To arrive at the conclusion that Article XII, Sect. 5 is clear, the majority finds that because the prohibiting clause of the 1974 Constitution is virtually the same as that of Article IV, Sect 16 of the 1921 Constitution, the former should be interpreted to mean the same as the latter. Only then does the majority seek to give meaning to the second sentence of the 1974 provision, the empowering clause. In spending so much time discussing the meaning of the prohibiting clause of the 1921 Constitution, the majority fails to give adequate consideration to the significant addition of the empowering clause in the 1974 Constitution.
Indeed, the majority uses a rule of interpretation which states "when a constitutional provision is identical or very similar to that of a former constitution, it is presumed that the same interpretation will be given to it as was attributed to the former provision." I agree with this principle of constitutional interpretation; however, the inclusion of the empowerment clause in the 1974 Constitution rendered the instant provision so dissimilar from the 1921 provision that application of this rule seems erroneous in this case.
Thirdly, the majority additionally states that even where resort to the transcripts is proper, they "furnish an uncertain and unreliable guide in the interpretation of constitutions and laws and may be of little value as expressions of the convention as a whole." I note, however, that this court has not had a problem in relying on transcripts before, as they have been a pivotal determinant in other cases by this court wherein we were called upon to interpret various provisions of the constitution. See, e.g., Polk, et al. v. Edwards, et al., 1993 WL 364714 (La.1993); State v. Peart, 621 So.2d 780 (La.1993); Cajun Elec. Power v. Public Serv. Com'n, 544 So.2d 362 (La.1989); Bd. of Directors of La. Recovery Dist. v. All Taxpayers, Property Owners, and Citizens of State of La., 529 So.2d 384 (La.1988); Bd. of Com'n of Orleans Levee Dist. v. Dept. of Natural Resources, 496 So.2d 281 (La.1986); Sibley v. Bd. of Sup'rs of La. State University, 477 So.2d 1094 (La.1985); Francis v. Morial, 455 So.2d 1168 (La.1984); State v. Manuel, 426 So.2d 140 (La.1983); Loyacano v. Loyacano, 358 So.2d 304 (La.1978); and State v. Roach, 338 So.2d 621 (La.1976). Accordingly, the transcripts are a relevant source of guidance in this case and can be used for determination of the intent behind the inclusion of the second sentence.
Finally, the majority opines that no delegate even suggested the legislature would be able to make less than all children forced heirs. A fair reading of the transcripts reveals the inaccuracy of the majority's statement as seen in the following excerpts from those transcripts:
Mr. Fontenot:
Mr. Stinson, I see there's no reference to the provisions which [sic] had in the old constitution which had to do with adopted children having the same rights as legitimate children. Why did you all leave that provision out of there?
Mr. Stinson:

Because it doesn't say even "children" it says "forced heirs" and the legislature will say who forced heirs are. In this section we don't even refer to children. It just says "forced heirs as shall be determined by the legislature."
Mr. Fontenot:
But, in the old constitution adopted children, regardless of what the legislature *1193 says, have the same rights as legitimate children, yet, we're not saying that in this new constitution, the way I read it.
Mr. Stinson:
The committee felt that it shouldn't be in the constitution. Neither do they say that children will be forced heirs of fathers and mothers and their ascending line. It will be left up to the legislature.[38]
See also the following discussion concerning the legislature's power under the empowering clause.
Mr. Avant:
Mr. Dennery, this is just one of those questions for the record. If your amendment is adopted, then, under the section as amended, the legislature would have the right by statute to change the classification of persons who are forced heirs, change the amount of the forced portion, or do virtually anything that, in their wisdom, they thought was correct with the systeminsofar as correcting what they may feel to be inequities but they could not abolish the system. There would be a system of forced heirship, but what it consisted of, and all the refinements thereof, would be up to the legislature?
Dr. Dennery:
Yes, sir. That's the whole purpose of this section, and I believe, Mr. Avant, that that's basically the law as it presently stands.[39]
Furthermore, although the majority correctly notes that an amendment to omit the prohibiting clause from the constitution was rejected, the Framers nevertheless did vote to give the legislature the power to determine forced heirs, thereby indicating that while the Framers did not want to completely abandon the concept of forced heirship, they did want to allow the legislature flexibility to vary its nature.

Analysis of La. Const. Art. XII, Sec. 5
The language of constitutional provisions must be fairly construed to give effect to the indicated purpose, and "in the event of a conflict or inconsistency, provisions should be construed, if possible, to allow each provision to stand and be given effect," Eiche v. Board of Elementary & Secondary Education, 582 So.2d 186, 189 (La.1991) (emphasis added), "and to render none nugatory." Central Louisiana Electric Co. v. Louisiana Public Service Commission, 205 So.2d 389, 391 (La.1967) (emphasis added). See also, State ex rel. Guste v. Board of Commissioners, 456 So.2d 605, 609 (La.1984); Barnett v. Develle, 289 So.2d 129, 146 (La.1974).
Forced heirship, as protected in 1921, is not the institution protected in the prohibiting clause of the 1974 Constitution. It was necessarily modified by the people's 1974 grant of power to the legislature to decide who should be forced heirs. As the majority itself notes, "[t]he people made the constitution, and the people can unmake it. It is the creature of their own will, and lives only by their will." Cohens v. Virginia, 6 Wheaton (19 U.S.) 264, 389 (1821) (Emphasis added). It appears to me the people have exercised their rights and have revised the previously existing concept of forced heirship protected under the Louisiana Constitution, by the inclusion in 1974 of the empowering clause. Under the guise of "defenders of the civil law" the majority most significantly errs in completely ignoring the positive grant of authority to the legislature to define the class of forced heirs.[40] The majority has perhaps overlooked the fact that the people ratified *1194 all of Article XII, Sect. 5 with one pull of the lever. The two clauses are meant to be interpreted together. It could not be any clearer but that the people desired the definition of forced heirship protected under the prohibiting clause be necessarily limited by the empowering clause. The people did not vote on the meaning of the prohibiting clause first and only later look to granting the legislature what the majority styles "residual powers" as a mere afterthought. Rather, they intended the empowering clause to be considered part and parcel in determining the definition of forced heirship. Therefore, the people could not possibly have meant to enshrine in the 1974 prohibiting clause the institution as protected under the 1921 Constitution but clearly intended to temper it to the extent the legislature could exercise its powers under the empowering clause as long as some vestige of the historical notion of forced heirship remains.[41]
Had the Framers desired strictly to preserve the 1921 notion of forced heirship, the empowering clause, which allows the legislature to determine forced heirs, would not have been included. The majority's erroneous interpretation of Article XII, Sect. 5 has turned a positive grant of authority contained in the empowering clause into meaningless, insignificant prattle by interpreting it as allowing the legislature to make only those changes which it was allowed to make under the 1921 Constitution prior to the inclusion of the empowering clause and nothing more. Had this been the intent and had the prohibiting clause under the 1974 Constitution been intended to protect the same notion as was protected under the 1921 Constitution, then it would have been completely unnecessary to add the empowering clause. It is extremely audacious to assume the people ratified the empowering clause with the intent it have no meaning. The majority opinion concludes the institution protected under the 1974 prohibiting clause is identical to that protected under the 1921 prohibiting clause and that the only legislative powers exercisable under the 1974 empowering clause are those which were already available under the 1921 prohibiting clause. If this were true, it would have been completely unnecessary for the Framers and the people to have included the empowering clause, as the legislature would already have had these limited powers under the 1974 prohibiting clause, which is virtually identical to its 1921 predecessor. It is nonsensical to conclude the Framers and the people would have engaged in such a fruitless task.
If the legislature does not have the authority to determine that less than all descendants should be forced heirs, as found by the majority, it becomes extremely difficult, if not impossible, to give any meaning to the legislature's constitutional mandate to determine forced heirs. There are two possible actions the legislature could take under its mandate to determine forced heirs, either to expand the class of forced heirs or to eliminate forced heirship; however, neither of these is supported by the actions and understanding of the Framers or by the broad language used in the empowering clause.
First, had the intent been nothing more than to allow for expansion of the class of forced heirs, such could have simply been mandated in a more limited grant of legislative authority. Furthermore, if one thing is certain, there is absolutely no indication in the records of the Constitutional Convention that the intent behind the inclusion of the grant of authority was to allow for an expansion of the class of forced heirs.
Secondly, had the empowering clause been intended only to allow for elimination of ascendant forced heirship, the empowering clause could have been limited to one allowing the legislature to eliminate ascendant forced heirship only when defining forced heirs, or, the prohibiting clause could have expressly protected only descendant forced heirship from abolition. Indeed, a proposal to have the first sentence of Section 5 protect descendant forced heirship only was deleted by the proposal's sponsor,[42] thus reflecting *1195 the Framers' awareness of their option to limit the legislature's exercise of authority to elimination of ascendant forced heirship only.
Rather than contain either of these possible limitations, however, the Section approved by the Framers and ratified by the citizens of the State of Louisiana literally grants the legislature the broad power to "determine forced heirs." Therefore, because the provision, as written, does not tolerate any of these possible interpretations, they must be rejected. Thus, regardless of what the protected institution of forced heirship was under the 1921 Constitution, that constitutional institution was necessarily limited in 1974 as reflected by inclusion in the 1974 Constitution of a grant of authority to the legislature to decide who should be forced heirs. In light of this inclusion, I believe the majority errs in holding the prohibiting clause of the 1974 Constitution precludes the legislature from excluding certain descendants from the class of forced heirs. Simply stated, the notion of forced heirship as protected in the prohibiting clause cannot be defined to require that all descendants be forced heirs because the very next sentence gives the legislature the specific authority to decide who shall be a forced heir.
This approach for interpreting conflicting constitutional clauses within one provision was used by this court in Earhart, supra, wherein we held the legislature had not unconstitutionally abolished forced heirship when it exercised its authority under the same constitutional provision to allow creation of certain trust estates. In explaining how the abolition clause and the trust clause related to one another, this court stated:
We find contained in this same provision of the constitution, which forbids the abolishment of forced heirship, authority granted to the legislature to create trust estates for a period not exceeding ten years after the death of the donor. The framers of the constitution evidently contemplated that the creation of such trust estates was not the abolishing of forced heirship. To construe the provisions of this article otherwise would be tantamount to accusing them of folly.

Earhart, 57 So.2d at 697 (emphasis added).[43]
This holding is directly on point with this case, and the majority errs in summarily dismissing it. The majority misstates the Earhart holding by asserting this court held the trust fell "within the exception to the Article IV, § 16 prohibition against abolishment of forced heirship which reserved to the legislature the power to authorize the creation of trust estates." As clearly shown by the above passage from Earhart, however, the court did not treat the legislative power to create trusts as an "exception" to the larger institution of forced heirship, but rather believed that because the constitution granted the legislature authority to provide for trusts, any exercise of that grant could not be an abolition of forced heirship.[44]
Following our mandate to give both sentences of this Section substantive meaning, I believe the Earhart rationale should be applied herein. Applying an identical analysis to this case, "[I] find contained in this same provision of the constitution, which forbids the abolishment of forced heirship, authority granted to the legislature to [determine forced heirs]. The framers of the constitution *1196 evidently contemplated that the [determination of forced heirs by the legislature] was not the abolishing of forced heirship. To construe the provisions of this article otherwise would be tantamount to accusing them of folly." Thus, the definition of the protected institution of "forced heirship" was limited by the constitutional Framers' insertion, and the popular vote in favor of, the empowering clause of Article XII, Section 5 giving authority to the legislature to determine forced heirs.
Notwithstanding the majority's assertion to the contrary, this interpretation of the empowering clause does not render the prohibiting clause nugatory. The majority refuses to recognize the possibility of a middle ground, an interpretation which gives equal dignity to both clauses of Section 5 and which is consistent with the people's desire, (as reflected by the legislative changes to forced heirship), with the Framers' inclusion of the empowering clause, and with the popular vote which ratified it, to move away from the traditional civilian notion of forced heirship. This middle ground may be found by ascribing the following meaning to the prohibiting clause. Because the constitution grants the legislature the authority to determine forced heirs, any limitation directly based on that authority would be impermissible. Simply speaking, because the empowering clause explicitly grants the legislature the power to decide who should be forced heirs, the definition of the institution of forced heirship protected in the first sentence cannot be one requiring that all descendants be forced heirs. Rather, any restriction on this legislative power to be found in Section 5 must be derived from the abolition clause, which protects the institution of forced heirship from abolition. On an institutional level, the abolition clause protects the essence of forced heirship by prohibiting abolition of all of the elements which have traditionally comprised it.[45] That is, as long as the laws resulting from the legislature's exercise of its authority to determine forced heirs and the forced portion retain some of the historical essence of forced heirship, the institution has not been unconstitutionally abolished.[46]
Historically, as even the opponents concede, the essence of forced heirship has, at varying times, included a component of support.[47] All parties to the instant litigation further agree that the amendments to La. *1197 Civ.Code art. 1493 effectuate a system of support. Because this support element of the historical essence of forced heirship has been retained, the institution of forced heirship has not been unconstitutionally abolished. Unlike the majority's interpretation of Section 5, which renders the empowering clause completely ineffectual, and which only pays lipservice to traditional rules of constitutional interpretation, the foregoing approach truly gives equal dignity to both clauses and concludes the Framers and the voting populace did more than merely participate in an exercise in futility with their inclusion of the empowering clause in 1974.
While the majority styles itself "defenders of the civil law" I feel compelled by my duty to uphold the present Constitution of the State of Louisiana and must give equal dignity to the conflicting clauses of Article XII, Sect. 5. Any interpretation of "forced heirship" as protected in the prohibiting clause which would prohibit the legislature from "determining forced heirs" as it has done in the 1989 and 1990 amendments to La.Civ. Code art. 1493 simply fails to give equal substance and meaning to the people's constitutional grant of power to the legislature to determine forced heirs.
Because I find no violation of Article XII, Section 5 in this case, I find it necessary to address whether the legislation violates La. Const. Art. I, Sec. 3, the equal protection clause.

Louisiana Constitution Article I, Section 3 (1974)
There is great difficulty in distinguishing the two constitutional challenges to Article 1493. Indeed, the arguments to this court in brief, in law review articles on the subject, and by the majority, when it continually refers to "equality of heirship", frequently appear to commingle the two issues. In addressing whether Article 1493 is a violation of equal protection, we should look only at what the provision says and does on its face, and that is to provide certain classes of heirs, those under 23 or physically infirm or mentally incapable, with a right to a forced portion of their parents' estates, while not providing that to other heirs.
The trial judge in this case found Article 1493, as amended, to be in violation of Article I, Sec. 3 of the Louisiana Constitution. Section 3 states in pertinent part:
No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations.
The Louisiana Constitution differs from the United States Constitution with respect to equal protection in that our constitution specifically enumerates which classifications receive particular levels of scrutiny.[48] Because of this and because the jurisprudential analysis used under the U.S. Constitution is inconsistently applied, we rejected federal analysis as our model for interpreting Louisiana's constitutional guarantee of equal protection in Sibley v. Board of Supervisors of Louisiana State University, 477 So.2d 1094 (La.1985).
In Sibley, this court stated that when a classification is based on "birth, age, sex, culture, physical condition, or political ideas or affiliations, its enforcement shall be refused unless the state or other advocate of *1198 the classification shows that the classification has a reasonable basis."[49] This level of review provided for in our constitution was intended to be similar to the "intermediate scrutiny" test applied to the Federal Constitution.[50] The primary difference, however, is that while the United States Supreme Court chooses to apply the intermediate scrutiny analysis to an extremely limited category of classifications, based on the Court's changing assessment of social policy, our constitution provides that such review shall be afforded when a particular, enumerated classification is involved. Because Article 1493 on its face discriminates on the basis of age and physical condition,[51] both enumerated classes under our constitution, it is necessary to determine whether the classifications are arbitrary, capricious, or unreasonable.[52] To avoid a finding of unconstitutionality, a classification based on physical condition or age must "substantially further[] a legitimate state purpose."[53] In furthering the state purpose, the classification must not be arbitrary, capricious, or unreasonable.
In analyzing the classifications found in Article 1493, the first inquiry must be a determination of the state interests leading to the classification. Implicit in the article is the balancing by the State of two independent interests. First, the State obviously intended to permit greater freedom of testation. While the abolition clause of Article 12, Section 3 of the constitution limits the legislature's ability to provide total freedom of testation, expansion of freedom of testation within those confines is a legitimate purpose. To the contrary, Article 1, Section 4 provides in part: "Every person has the right to *1199 acquire, own, control, use, enjoy, protect, and dispose of private property." Article 1, Section 1 describes these rights as "inalienable" and provides further that they "shall be preserved inviolate by the state." Therefore I believe that enhanced freedom of testation is indeed a legitimate state interest. The second state interest applicable here stems from the legislature's recognition that there is a category of descendants who traditionally have a greater dependence on familial support. Certainly, providing assistance to those who may be otherwise incapable of supporting themselves is a legitimate state purpose.[54]
As Justice Marcus noted in Talley, the focus is not on the "general purpose[s] of the statute," but on the "state interest purportedly promoted by treating [persons] differently."[55] In this case, the reason for creating the classifications is found in the balancing of these two seemingly contradictory state interests. In other words, the legislature sought to achieve the greatest degree of freedom of testation possible while at the same time providing the protection of forced heirship to those heirs most likely to need it. Because the two goals are legitimate state interests when standing alone, I believe the legislature had a legitimate, permissible purpose when it sought to balance these two interests in order to provide a system of support to certain heirs while at the same time increasing freedom of testation.
Having determined the legislature had a legitimate, permissible "state purpose" in creating the classifications based on age and mental incapacity or physical infirmity, the next issue to be addressed is whether the classifications chosen substantially further that state purpose. In reducing the class of forced heirs from all heirs to those under 23 and those who are mentally incapable or physically infirm, the legislature has obviously substantially furthered its permissible goal of greater freedom of testation.[56] By providing that children under the age of 23 and children of any age who are mentally incapable or physically infirm will be forced heirs entitled to a certain amount of each parent's estate, the legislature has clearly chosen a means which substantially furthers its legitimate state interest of providing protection to those heirs most likely to need it.
Further, the classifications chosen are not arbitrary or capricious, or unreasonable.[57] If the legislature's only goal was freedom of testation, and if it did not have an alternative goal of protecting those heirs incapable of providing for themselves, then the classifications based on age and physical condition would be completely arbitrary. However, such a finding would ignore the dual purposes of the article as explained above. Therefore, a determination of whether the classes created are arbitrary or capricious in light of the legislative intent to create a system of protection for these heirs is proper.
In balancing the dual interests of freedom of testation and protection of those children most likely to need it, the legislature limited the class of forced heirs to children under the age of 23, or any other child who is mentally incapable or physically infirm, because it found those children were most likely to be unable to provide for themselves at the time of their parents' deaths. A finding that children who are 23 or older and not mentally *1200 incapable or physically infirm are capable of providing for their own support is not "marked by whim" but rather is supported by "reason." The legislative conclusion that by the time a child reaches the age of 23, he or she is either completing or has completed his college education, or has had time to obtain gainful employment following secondary education is reasonable. The reasonableness of making those who are physically infirm or mentally incapable forced heirs is obvious.
It is true that there might be a few children 23 or older who are not mentally incapable or physically infirm who may nevertheless be in necessitous circumstances. However, the legislature's classification is not based on need, but rather on the ability of a child to provide for himself or herself when he or she is 23 or older and not physically infirm or mentally incapable. It is not unreasonable for the legislature to believe that persons in this class are capable of providing for themselves. Additionally, "in the area of economics and social welfare, a legislature does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.... [A classification] does not offend the constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality." Bazley v. Tortorich, 397 So.2d 475, 484 (La.1981). Any age that the legislature ever chooses for a classification necessarily lacks empirical precision and can never fully effectuate the legislature's intent behind the classification.[58] However, the constitution only requires that the state purpose be "substantially furthered." Thus, the fact that this classification might exclude some children 23 or older who are mentally and physically competent but who for some reason are not capable of providing for their own support does not render the classification unreasonable where it nevertheless "substantially furthers" the state purpose of providing for those incapable of providing for themselves. The legislature's decision to make this particular class of people forced heirs was, therefore, not arbitrary, capricious, or unreasonable.[59]

CONCLUSION
For the foregoing reasons, I find Article 1493, as amended, is not a violation of either La. Const. Art. XII, Sec. 5 or of La. Const. Art. I, Sec. 3. Therefore, I respectfully dissent.
NOTES
[*] WATSON, J., not on the panel. Rule IV, Part 2, § 3.
[1] Actually, the majority states that a law which abrogates the "right of equality of heirship among children is unconstitutional." It seems to me the majority has confused the doctrine of collation, which presumes an equality of treatment of all children of a decedent, with the institution of forced heirship. Forced heirship has never had as one of its goals "equality of heirship." Through lawful disposition of the disposable portion of one's estate, an exorbitant disparity in the treatment of one's forced heirs may be achieved. The institution of forced heirship is not concerned with this inequality, but rather addresses only equal division of the forced portion of one's estate. Thus, the equality of heirship goal which the majority states as a policy behind forced heirship cannot be attained through any application of the institution of forced heirship.
[2] Joseph Dainow, The Early Sources of Forced Heirship; Its History in Texas and Louisiana, 41 La.L.Rev. 42, 58 (1941).
[3] Leonard Oppenheim, 10 Louisiana Civil Law Treatise: Successions and Donations § 161 at 276 (1973).
[4] Dainow, supra n. 2 at 43.
[5] Dainow, supra n. 2 at 44; M. Planiol, 3 Civil Law Treatise § 3054, at 492, 11th Ed. La. State Law Institute Translations (1959); Aubry & Rau, 3 Civil Law Translations § 678 at 187 (Lazarus 1969); Michael Porter, 37 Tul.L.Rev. 710, 711 (1963).
[6] Dainow, supra n. 2 at 43.
[7] Dainow, id. at 44.
[8] Id.
[9] Id. at 45.
[10] Id.
[11] Id. at 46.
[12] See Dainow, supra n. 2 at 48; Planiol, supra n. 5, § 3054 at 492; Aubry & Rau, supra n. 5, § 678 at 187 (referring to the institution as the plainte d'inofficiosite); Porter, supra n. 5 at 712; Oppenheim, supra n. 3, § 161 at 276.
[13] Aubry & Rau, id.
[14] Id.
[15] Planiol, supra n. 5, § 3054 at 492; Aubry & Rau, id. (referred to by these authors as pars legibus debita ); Dainow, supra n. 2 at 49.
[16] Planiol, supra n. 5, § 3055 at 493; Aubry & Rau, supra n. 5, § 679 at 195-96; Porter, supra n. 5 at 714.
[17] Planiol, id.; Aubry & Rau, supra n. 5, § 678 at 188; Porter, id.
[18] Id.
[19] Planiol, id.
[20] Planiol, id.; Porter, supra n. 5 at 714.
[21] Planiol, supra n. 5, § 3056 at 494; Aubry & Rau, supra n. 5, § 678 at 191.
[22] Planiol, id.; Porter, supra n. 5 at 719.
[23] Dainow, supra n. 2 at 54-55; Porter, supra n. 5 at 716.
[24] Porter, id.
[25] The Roman law's falcidian portion was imposed for the benefit of the instituted heir only, whomever that might be, while that system's légitime, through the querela, was imposed for the benefit of ascendants, descendants, and collaterals of the decedent. The Spanish law, by contrast, granted the légitime to ascendants and descendants only, although the mejora granted some flexibility regarding the proportionate distribution to the descendant heirs. Finally, the French law granted the légitime to the smallest group of heirs, descendants only. In addition to the légitime, however, the French law also recognized the réserve which similar to the Roman légitime, was granted to ascendants, descendants, and collaterals.
[26] This support purpose of the French légitime is reflected in the limitation that the légitime would be awarded only if the réserve was inadequate to insure the claimant's welfare. See, also, Joseph Dainow, Forced Heirship in French Law, 2 La. L.Rev. 669, 671 (1940) ("The fundamental idea [behind the légitime] was the duty of maintenance."). Indeed, the redactors of the French Civil Code had faced a recommendation to retain the Roman tradition of making collaterals forced heirs, but this recommendation was dropped at the request of the government which believed that even the closest collaterals did not depend on each other for financial support as did children. 12 Fenet, 319-27, 444-46, 469-70; Planiol, supra n. 5, § 3075 at 503; Porter, supra n. 5 at 734.
[27] See, e.g., the enactment of La.Civ.Code art. 1480 (1825) increasing the disposable portion from one-fifth to a minimum of one-third.
[28] Additions and Amendments to the Civil Code of Louisiana (Projet of 1822) Book III, Tit. 2, reasons for the amendment of Art. 19 (official French version, p. 208).
[29] Additions and Amendments to the Civil Code of Louisiana (Projet of 1822) Book III, Tit. 2, reasons for the amendment of Art. 19 (official English version, p. 201).
[30] La.Civ.Code art. 1520. See, generally, Dainow, supra n. 2 at 67.
[31] Ordinance No. 305, titled "An Ordinance relative to the limitation of legislative powers," and providing, "No law shall be passed abolishing the principle of forced heirship or legalizing substitutions or fidei commissa or trusts affecting immovable property. Note. This is intended as a new article, there being none on the subject in the present Constitution." Official Journal of the Proceedings of the Constitutional Convention of the State of Louisiana (1921) at 274.
[32] The amendment's sponsor, Mr. Sidney Herold, perceived a danger to a democratic society if some individuals would be able to accumulate tremendous fortunes. This danger could be avoided, according to Mr. Herold, by a system which required forced heirship and which precluded trust estates. For this reason, Mr. Herold included this combination in one proposed constitutional amendment. See, e.g., Dainow, supra n. 2 at 68, n. 134; Handbook of the Association of American Law Schools for 1935, 84, 88-89.
[33] The proposed amendment, adopted as La. Const. Art. IV, Sec. 16, provided in 1921:

No law shall be passed abolishing forced heirship or authorizing the creation of substitutions, fidei commissa or trust estates; except that the legislature may authorize the creation of trust estates for a period not exceeding ten years after the death of the donor; provided that where a natural person is the direct beneficiary said period may be made to extend until ten years after his majority; and provided further, that this prohibition as to trust estates or fidei commissa shall not apply to donations strictly for educational, charitable or religious purposes.
[34] See 1952 La. Acts No. 208, § 1; 1958 La. Acts No. 548, § 1; 1962 La. Acts No. 521, § 1.
[35] The protection of forced heirship in the 1974 Constitution was relocated to Article XII, Section 5. This provision is quoted in the text, supra.
[36] As discussed infra, the Earhart court observed that "abolish" means "done away with wholly, wiped out or destroyed." Earhart, 57 So.2d at 697.
[37] Under the auspices of this express grant of additional power, the legislature continued to change forced heirship in Louisiana by reducing the forced portion and depriving the forced heir of immediate possession of his legitime. These changes are illustrated by the 1981 revision of La.Civ.Code art. 1493 (increasing the disposable portions), several amendments to La.Civ.Code art. 890 (expanding the surviving spouse usufruct), several revisions and amendments to La. Civ.Code art. 1505 (excluding certain assets from the active mass calculation, while crediting payment of the proceeds from such assets to the legitime if they are paid to a forced heir), enactment of La.Rev.Stat. 9:2354 (excluding inter vivos donations to spouses of previous marriages from the active mass calculation and from reduction claims), and enactment of La.Rev.Stat. 9:2372 (excluding certain inter vivos donations to charitable, educational or religious organizations from the active mass calculation and from reduction claims). The legislature also exercised its authority to determine forced heirs by repealing La.Civ.Code art. 1494 (eliminating ascendant forced heirship). This trend culminated in the passage of 1990 La. Acts No. 147, the legislation which is being challenged on constitutional grounds in the instant case. Although this court never passed on the constitutionality of any of these earlier changes, these changes may nevertheless provide some indication of what the people intended when they ratified the 1974 Constitution.
[38] State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts Vol. IX, p. 3073 (emphasis added).
[39] State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts Vol. IX, p. 3078 (emphasis added).
[40] The majority concludes "[i]f there had been any intention to empower the legislature to abrogate the fundamental principle and right of every child to equality of heirship in a forced portion of his or her decedent's estate, the document would have either explicitly so stated or would have omitted any mention of a forced heirship guarantee altogether." First, I do not see how the grant of authority contained in the empowering clause could have been any more explicit. Second, that the Framers saw it as unnecessary to remove the prohibition clause is reasonable in light of their inclusion of the empowering clause in the same provision, and is consistent with their desire to preserve some essence of forced heirship.
[41] The majority derives its definition of "forced heirship" from the 1921 Constitution first, and only later does it consider the second sentence of Article XII, Section 5 to determine whether the legislature's exercise of authority thereunder has abolished the 1921 notion of forced heirship.
[42] See, State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts, p. 102 (Exhibit "D" in record of 92-CA-3155 decided this day).
[43] The majority notes "the defenders of the civil law were forced to accept one compromise" in 1921 with the inclusion in the forced heirship provision of an explicit exception permitting the legislature to authorize the creation of certain trusts. If that is so then, likewise, the successors to those "defenders of the civil law" were forced to accept a compromise in 1974 with the inclusion in Article XII, Sect. 5 of an explicit provision authorizing the legislature to decide who should be forced heirs.
[44] The majority obscures the true import of Earhart not only by mischaracterizing the holding, but also by focusing almost entirely on rejecting dictum from Earhart which, if given the layman's interpretation which Louisianians most certainly gave it when they ratified the constitution of 1974 would be fatal to the majority's conclusion. The majority focuses so much attention on the definition of "abolition" because the true holding of Earhart, that there is not an abolition of forced heirship where the legislature exercises its constitutional authority under the same provision, is indistinguishable from the case herein.
[45] "Abolish" means "done away with wholly, wiped out or destroyed." Earhart, 57 So.2d at 697. Although this may have been dictum in Earhart, it nevertheless remains the commonly held definition of this term.
[46] I reject the argument made in briefs to this court that the amendments unconstitutionally abolish forced heirship because they define forced heirship to the exclusion of some descendants. This argument fails to give due deference to the legislature's authority to determine forced heirs by placing a direct limitation on that authority. I further note that under the 1974 Constitution, the protection against alteration and amendment by the legislature given to the individual rights found in Article I, the Bill of Rights, was not provided for forced heirship. See State of Louisiana Constitutional Convention of 1973 Verbatim Transcripts Vol. VI, p. 1037 ("The purpose of the amendment [to the proposed constitution] is to remove from the Bill of Rights any language with regard to forced heirship.").
[47] See, e.g., Cynthia A. Samuel, et al., Developments in the LawSuccessions and Donations, 45 La.L.Rev. 575, 594 (1984) ("Morally, forced heirship is an expression of the principle that a parent is obligated to support, maintain, educate, and provide for the future of his children." (emphasis added)).

See also Gerald Le Van, Alternatives to Forced Heirship, 52 Tul.L.Rev. 29, 31 (1977) (emphasis added) speaking of the Roman institution: "[The Roman system] effected a compromise between freedom and folkways: both the preservation of family destiny and the support of dependents could be accomplished to some extent in every case."; Dainow, supra n. 41 at 671, speaking of the French institution: "The fundamental idea was the duty of maintenance."
Some opponents argue support has never been a component of forced heirship citing a passage from Planiol's Civil Law Treatise, supra n. 5, § 3049 at 490, wherein he notes that the French reserved portion is not linked to a duty of support. These arguments fail to recognize that historically some of the limitations on freedom of testation were imposed as support mechanisms for the benefit of the decedent's family. For example, the French légitime, as opposed to the French réserve which Planiol speaks of in § 3049, was initially available only when the réserve was insufficient to adequately insure the descendant's welfare. Indeed, Planiol himself, in discussing the denial of the reserved portion to collaterals, notes "[e]ven the closest collaterals do not depend on each other for a living." Planiol, supra n. 5, § 3075 at 504 (emphasis added).
[48] The Fourteenth Amendment of the United States Constitution provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. Without any constitutional guidance, the United States Supreme Court has jurisprudentially created three tiers of scrutiny. Governmental action will receive strict scrutiny if a classification infringes on a fundamental or express constitutional right or if it discriminates against a "suspect" class such as race or ethnic origin. The law is presumed unconstitutional and will be struck down unless shown to be "necessarily related to a compelling state interest." A classification will generally receive intermediate scrutiny if it involves discrimination based on gender or illegitimacy. To be upheld under this level of review, the classification must be substantially related to a legitimate state interest. The lowest tier of review applies to any other classification and requires that the party challenging the law prove the classification is not rationally related to any legitimate government interest. Sibley v. Bd. of Supervisors of Louisiana State University, 477 So.2d 1094, 1105-07 (La. 1985).
[49] Sibley, id. at 1107. Sibley also recognized two other levels of equal protection analysis under the Louisiana Constitution. The highest level of protection the constitution affords is given to classifications based on race or religious beliefs. We stated that when a law involves such a classification, "it shall be repudiated completely." Sibley, id. at 1107. Thus, Louisiana's highest level of review under Art. I, Sec. 3 "offers more protection than the federal [strict scrutiny tier] because under [A]rticle I, [S]ection 3 such classifications are simply invalid. No scrutiny is required once it is determined that the classification is based on one of these grounds." Katherine S. Spaht, et al., The New Forced Heirship Legislation: A Regrettable "Revolution", 50 La. L.Rev. 409, 416 (1990).

Art. I, Sec. 3 also affords constitutional protection to non-enumerated classes because of its all-encompassing prohibition of the denial of equal protection of the laws contained in its first sentence. As to this level of scrutiny, the Sibley court concluded that "[w]hen the law classifies individuals on any other basis, it shall be rejected whenever a member of a disadvantaged class shows that it does not suitably further any appropriate state interest." Sibley, id. at 1107. Whether or not this analysis provides more protection than the federal lowest tier of scrutiny has not been specifically addressed by this court as it was only dictum in Sibley; however, it is not an issue in this case. See Crier v. Whitecloud, 496 So.2d 305, 313 (La.1986) (applying Louisiana's lowest level of equal protection review).
[50] See Butler v. Flint Goodrich Hospital, 607 So.2d 517, 526-27 (La.1992) (Dennis, J., dissenting) and Sibley, 477 So.2d at 1108 n. 24.
[51] To the extent that any "mental incapacity" under Article 1493 is not based on a "physical condition" under Art. I, Sec. 3 of the constitution, it would not receive the middle level of scrutiny applied to the enumerated list of classifications. I note, however, that if Article 1493 does meet the "intermediate scrutiny" test, it necessarily satisfies the lowest level of review under Article I, Section 3.

If Article 1493 passes the intermediate equal protection analysis under Art. I, Sec. 3 of our constitution, then it necessarily fulfills the requirements under the Fourteenth Amendment, as age and physical or mental condition usually receive the lowest level of scrutiny and occasionally, intermediate scrutiny, under the United States Constitution. Under the United States Constitution, a classification based on age will only receive strict scrutiny where the state uses an age-based classification with respect to the exercise of a fundamental right. See, e.g. Carey v. Population Services International, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977).
[52] Article 1493 also differentiates for forced heirship purposes with respect to representation by grandchildren. This factual situation is not implicated in this case. Because neither Ray or Glenn Lauga is affected by this classification, they may not raise its unconstitutionality. See Sherman v. Cabildo Const. Co., 490 So.2d 1386 (La.1986); Baehr v. City of Lake Charles, 387 So.2d 1160 (La.1980). On the other hand, Ray and Glenn are 23 or older and are not physically infirm or mentally incapable. Consequently, they may raise the unconstitutionality of these two types of classifications.
[53] Sibley, 477 So.2d at 1100. See also Kathleen Talley v. Succession of James Merkel Stuckey, 614 So.2d 55 (La.1993) which is this court's most recent application of Louisiana's intermediate level of protection under Article I, Section 3.
[54] That the means chosen to further the purpose of support do not provide support to all heirs does not render the purpose illegitimate but rather is a consideration during the second step of my equal protection analysis.
[55] Talley, supra n. 54.
[56] Some might argue that the legislature has not "substantially" furthered its goal of freedom of testation because it did not completely abolish forced heirship in Louisiana. The legislature did not do so for two reasons. First, such abolition is prohibited by the constitution and second, the legislature was concerned about providing support to those heirs who cannot provide for themselves.
[57] Roget's II, The New Thesaurus (1980) defines "arbitrary" as "[d]etermined or marked by whim or caprice rather than reason" or "[b]ased on individual judgment or discretion." Webster's 9th New Collegiate Dictionary (1991) defines "arbitrary" as "depending on individual discretion" or "based on or determined by individual preference or convenience rather than by necessity or the intrinsic nature of something." Roget's defines "capricious" as "[f]ollowing no predictable pattern." Webster's defines "capricious" as "governed or characterized by caprice."
[58] See, e.g., La.Rev.Stat. 32:405.1 (which provides that a regular driver's license is not available before the age of 15, a commercial license is not available before the age of 16 or 18 depending on the type, and a hazardous materials license is not available before the age of 21) and La.Civ.Code art. 29 (majority is attained upon reaching the age of 18 years).

In any case where a classification is based on age, it is easily arguable that there are certain members of the included class who should be excluded and certain members of the excluded class who should be included. For example, one of the purposes for placing age limits on the obtaining of driver's licenses is to insure that we only have capable, safe, mature drivers on the road. With respect to the general license, there is no doubt that there are mature 14-year-olds capable of driving safely yet who are prohibited from obtaining licenses and immature 15-year-olds with licenses who are incapable of driving safely. It is doubtful that society would prefer, in order to avoid all discrimination, that we not have an age limit at all and that children of any age be able to apply for a driver's license based on ability. Such would be extremely inefficient, and, not required under our constitution. The legislature need not choose a means which completely furthers its goal, but rather one which substantially furthers it.
[59] There is some indication in the Louisiana Constitution itself of what the delegates to the 1973 Constitutional Convention did not believe to be arbitrary, capricious, or unreasonable age discrimination. Art. I, Sec. 10 gives the right to vote to citizens "upon reaching eighteen." Art. III, Sec. 4(A) states that only a person who has "attained the age of eighteen years" at the time of qualification can run for the legislature. Art. IV, Sec. 2 provides that to be eligible for any statewide elective office a person must have "attained the age of twenty-five years" by the date of qualification. Art. 5, Sec. 23(B) states that a "judge shall not remain in office beyond his seventieth birthday."